[Crim. No. 15.   Third Appellate District.—November 16, 1905.]

# THE PEOPLE, Respondent, v. HARRY BUNKERS, Appellant.

CRIMINAL LAW—BRIBERY OF LEGISLATOR—TESTIMONY OF ACCOMPLICES—CORROBORATION—QUESTION OF FACT.—Upon trial of a legislator accused of accepting a bribe, the question whether or not any witnesses for the prosecution were accomplices, or whether any of them were corroborating witnesses, who were not accomplices, was one of fact for the jury to determine.

ID.—SUPPORT OF VERDICT—CONFLICTING EVIDENCE AS TO PARTAKERS OF CRIME.—Before it can be concluded that the verdict must fail for want of corroboration of an admitted accomplice, it must appear without substantial conflict that all the witnesses for the prosecution were *particeps criminis;* and where there is conflicting evidence on that question, it must be assumed in support of the verdict that the jury found to the contrary, and had the right to view other testimony as corroborative of the testimony of the admitted accomplice.

ID.—WITNESSES NOT PARTAKERS OF CRIME—DETECTION OF CRIME.—Witnesses who did not suggest, advise or encourage the commission of the offense, and who had no criminal intent, but who engaged in a scheme merely to detect, expose and punish the crime, are not partakers of the crime and may be properly considered as corroborating witnesses.

ID.—DEGREE OF CORROBORATION REQUIRED.—While corroborating evidence must create more than a mere suspicion of the commission of the offense, it is not required to be absolutely convincing, and need not extend to every fact and detail covered by the testimony of accomplices; but it is sufficient if, standing alone, it tends to connect the defendant with the crime.

ID.—INVESTIGATION BEFORE LEGISLATIVE COMMITTEE—BRIBERY TO PROTECT ASSOCIATIONS.—Where the bribe was accepted by the legislator as chairman of a committee appointed to investigate the affairs of building and loan associations, with power to subpoena witnesses, in order to protect certain associations from investigation, it is not necessary to show that any investigation of such association was pending. It was sufficient that the committee was engaged in a general investigation of similar associations, and that the investigation of such other associations was matter upon which defendant might be required to act in his official capacity.

ID.—TESTIMONY OF ACCOMPLICES TO CONVERSATIONS WITH DEFENDANT—ORDER OF PROOF.—An accomplice may testify to declarations made by the defendant, and even if it be conceded that proof of the conspiracy between them should first be made, the order of proof was discretionary, and not mandatory; and where there is other evidence

to show the relations between them, it cannot be said that the court erred in admitting the testimony.

ID.—CONVERSATIONS WITH ACCOMPLICE—TRACING OF MONEY USED `AS BRIBE.—Conversations with the accomplice, who was connected with the bribing of the defendant and other legislators, were properly admitted in evidence; and such evidence and that of other witnesses was admissible to trace from its source to its destination the money used as a bribe, and to show that the witnesses giving such evidence were not accomplices.

ID.—CULPABILITY OF WITNESSES—GUILT OF DEFENDANT.—The culpability of witnesses or the lack of it cannot minimize the guilt of the defendant.

ID.—PLOT TO ENTRAP DEFENDANT—DETECTION OF DANGEROUS CRIME—CORROBORATIVE EVIDENCE.—The plan to entrap the defendant, having for its object the detection of a crime fraught with danger to the state, and which amounted to nothing more than procuring corroborative evidence essential to a conviction, cannot render inadmissible the testimony of those engaged in it.

ID.—CRIME NOT ENCOURAGED.—Such methods, under the circumstances here appearing, are not within the rule against encouraging crime merely to procure its commission, to the end that those willing to become offenders may be punished, but they fall within that other rule which justifies dissembling to procure additional and necessary evidence of guilt.

ID.—CHARGE OF ASKING AND RECEIVING BRIBE—VERDICT—INSTRUCTION. Where the defendant was charged conjunctively with asking and receiving a bribe, and the jury found him guilty as charged in the indictment, an instruction that either asking or receiving the bribe would justify a verdict of guilty is not erroneous, nor could it have harmed the defendant.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial. E. C. Hart, Judge.

The facts are stated in the opinion of the court.

H. V. Morehouse, J. E. Alexander, J. S. Partridge, and F. C. Jacobs, for Appellant.

U. S. Webb, Attorney General, and A. M. Seymour, District Attorney, for Respondent.

McLAUGHLIN, J.—The defendant was convicted of a felony, to wit, asking and receiving a bribe while a member of the Senate of the state of California, contrary to the provi-

sions of section 86 of the Penal Code. From the judgment against him and from an order denying his motion for a new trial, he prosecutes this appeal.

It is unnecessary to insert a copy of the indictment, or to consider its sufficiency in this opinion, for such sufficiency was carefully considered in another proceeding, and a copy of the indictment is continued in the decision therein filed. (*Application of Bunkers,* 1 Cal. App. 61, [81 Pac. 748].)

It is contended that the evidence is insufficient to support the verdict and judgment. This contention does not rest on any claim that there is no evidence tending to prove guilt, but is based on the proposition that the only testimony in that behalf was given by accomplices of the accused, and that such evidence lacks the corroboration essential to sustain the verdict rendered. The evidence is voluminous, and it would serve no useful purpose to embody more than an epitomized rehearsal of that portion thereof pertinent to the proper consideration and elucidation of this and other important points presented. It appears: That appellant was chairman of a committee of the Senate known as the "Committee on Commissions and Retrenchment," and as such chairman had power to issue subpoenas for witnesses to appear before said committee. That this committee had commenced an investigation of the affairs of the Continental Building and Loan Association and other corporations and associations engaged in a business of like character. It is shown by the testimony of one Joseph S. Jordan, the principal witness for the prosecution, that he met appellant on the ferry-boat going to San Francisco on Friday, January 20, 1905. That, in reply to inquiries; appellant said that the Continental was not the only building and loan association under investigation, that all of them, including the Phoenix, would be investigated before the committee got through with them, and subpoenas would issue for Clarence Grange, secretary and manager of the Phoenix, and other persons connected with said association. Jordan thereupon expressed an interest in Grange and the association of which he was manager, and after some parley it was agreed that subpoenas for Grange and his associates would be withheld until Jordan could see Grange, and that they would meet again the next evening. Jordan then went to see Grange and told him of conditions in Sac-

ramento, and what had been said by appellant. At the evening meeting Jordan informed appellant that he had seen Grange and that he (Jordan) thought "those people would pay for being let alone, if there were no subpoenas issued or at the worst a favorable report on the Phoenix, and one or two others." Appellant suggested another meeting the next day at noon, and at this meeting Jordan mentioned a sum as the proper price to be paid for immunity for the Phœnix, Renters' and Pacific States associations, but appellant said he would have to see Senator French, who was then in San Francisco, and that he expected to see him at 3 o'clock, at which time it was agreed that appellant and Jordan would meet again. When they met in the afternoon, appellant stated that he had seen French and that it had been agreed that if $500 each was paid to Senators Emmons French, Wright and Bunkers, who constituted a majority of the committee, that the associations last named would be protected, no subpoenas would issue, and no investigation would be had as to them. Appellant also said that it would take at least $10,000 to stifle investigation touching the affairs of the Continental. The proposition made by appellant was placed before Grange, who said the arrangement was all right, that he would see the various managers that night and meet Jordan in Sacramento under the name of Bill Newell, and bring the money with him. The next day Grange telephoned to Jordan from San Francisco, saying that the Pacific States had fallen down, and hence only $350 would be paid each senator, and that he could not come to Sacramento, but that another man under the same name would come up with the money and meet Jordan at the latter's room. This Newell, who proved to be a detective named Tichenor, met Jordan at the place appointed, made himself known, stated that he had the money, but would insist on paying each senator personally. There was some disagreement as to this and the sum to be paid Jordan for his labors in the premises, but the detective finally agreed to procure $100 additional for Jordan, and the latter departed for the purpose of informing appellant as to the changes and conditions. They met in the corridor of the Senate, and appellant for himself and associates flatly refused to accept payment from Tichenor. Jordan then sought Tichenor, and it

was finally agreed that Jordan should pay each senator $350, and that Tichenor should witness such payment. They then repaired to Jordan's room, where the money was taken from five envelopes, four of which contained $350 each, and the fifth $150, all in $50 bills. Jordan was given the smaller sum, and the remainder was made into four packages of $350 each, and Jordan placed such packages in his pockets and went in search of the senators, Tichenor agreeing to keep him in sight. Jordan met appellant near the opera-house on K street, made know his mission, and the pair walked up K street and turned the corner into Eighth, where Jordan, at appellant's request, dropped one of the packages of currency into appellant's pocket. This package contained seven $50 bills, appellant's *pro rata* of the money sent up by Grange to insure the Phœnix and Renters' associations immunity and protection from investigation and subpoenas, in pursuance of the agreement made between Jordan and appellant. The testimony of Grange corroborated the testimony of Jordan, and it appears from the testimony of this witness, and the witnesses McNab, Heins, Russell, Older, Hartling, and Tichenor, that Grange consulted McNab on Sunday after Jordan had made known his mission. That thereupon a plan to entrap and procure evidence against the venal senators was arranged, and the two detectives, Tichenor and Hartling, were employed and instructed as to the plan and their part in carrying it into execution. That Grange procured part of the money from the manager of the Renters', furnished the balance himself, and placed it in five envelopes containing currency of the denomination and in the sums above mentioned. That, pursuant to a prearranged plan, he took these envelopes to the Mills Building and handed them to Heins, who was indicated by a nod from McNab. That Heins took the envelopes to Older, who counted the money and returned five envelopes containing the identical sums to Heins, who handed them to Tichenor pursuant to the prearranged plan. That later Grange took another envelope containing $100 to Heins at the same place, and Heins took it to Older, who substituted a hundred dollar bill for the coin and currency first contained in the envelope, and returned it to Heins, who delivered it to one Russell, and he brought it to Sacramento

and gave it to Tichenor. That Tichenor and Hartling came to Sacramento, the former for the express purpose of paying the money to the senators, and the latter to witness such payment. The two last-named witnesses witnessed the payment by Jordan to appellant, and Tichenor corroborated Jordan as to conversations, movements, etc. Hartling witnessed the conversation between Jordan and appellant in the corridor of the Senate, saw Jordan and Tichenor meet the first time, and corroborated both of the witnesses last named in other particulars. Older took the numbers of the bills and marked the same on the envelopes, which were also marked "A," "B," "C," "D," "F." Tichenor retained the envelopes at the time the money was given to Jordan, and they were introduced in evidence. The reporter employed by the committee, who was present at the meetings thereof, gathered from what was said that the committee was going to investigate building and loan associations, and "get-rich-quick" concerns. There was further testimony to the effect that the Continental and Pacific associations, and some syndicates, were investigated by the committee, and that subpoenas for numerous witnesses had been issued and served. The evidence clearly shows that neither the Phoenix nor the Renters' associations were investigated, and that no subpoenas were issued for officers of said associations. Appellant did not deny meeting Jordan at times and places mentioned by the latter, but according to his version their conversations related to common-place matters and were entirely innocent. Appellant had no conversations with any of the witnesses named, save Jordan, and the latter knew nothing whatever about the plan to entrap and expose the senators until the matter was made public. In acting as a messenger between appellant and Grange and Tichenor, he acted seriously, and supposed the money was obtained and paid for the purpose of purchasing immunity for the two associations contributing. The evidence also shows that Senator French was in San Francisco at the time appellant sought and had a meeting with him. It is clear from the foregoing skeleton rehearsal of the evidence that, if all participants in the transaction described were accomplices of the accused, then the corroboration required by section 1111 of the Penal Code is lacking, and the verdict must fall. Whether or not they, or

either of them, were such accomplices, was a question of fact for the jury to determine. (*People* v. *Creegan,* 121 Cal. 557, [53 Pac. 1082] ; *People* v. *Compton,* 123 Cal. 407, [56 Pac. 44] ; *People* v. *Bolanger,* 71 Cal. 17, [11 Pac. 799] ; *People* v. *Curlee,* 53 Cal. 607.)

It is admitted that the witness Jordan was an accomplice, and the jury was instructed accordingly. As this admission by the prosecution is distinctly favorable to the appellant, further inquiry may be confined to the question whether or not there was evidence before the jury to warrant the conclusion that other participants named were not *particeps criminis.* An accomplice is "an associate in the commission of a crime; a participator in an offense, whether as principal or accessary." Under the law of this state all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, or aid, or abet or have advised or encouraged its commission, are principals. Therefore, before we can conclude that the verdict in this case must fall, for the reason now under consideration, we must be convinced that the evidence would warrant a jury in finding that the corroborative evidence was given by witnesses who were principals in the commission of the offense, under the rule just stated. More than this, it must appear that the evidence is without substantial conflict on this point. For, if there is a conflict, it must be assumed in aid of the verdict that the jury found to the contrary, and therefore had a right to view this evidence as corroborative of the testimony of Jordan. Keeping this before us, we will examine the evidence for light on the problem to be solved. The very nature of the crime here charged is such that there can be no hesitancy in saying that none of these witnesses could or did directly commit the acts constituting it. As neither of them ever conversed with appellant they could not, and did not, directly, advise or encourage him to ask for or receive a bribe.

There is no evidence tending to show that any of them suggested to Jordan, or anyone else, that appellant be advised or encouraged to commit this offense. The only possible theory upon which it could be said that any of them aided or abetted, or encouraged its commission, is that they, or some of them, assisted in procuring the money and in

giving it to Jordan. Certain it is that, if any offense was committed by reason of such acts, it was the offense of offering to give and giving a bribe under section 85 of the Penal Code. If, then, these witnesses were guilty under that section, and they certainly were, if an offense was committed by them, to hold that they were also accomplices guilty as principals under the succeeding section would be to lay down the rule that each of them, and the appellant as well, could be active offenders in the commission of one crime, and be accomplices in the commission of another, at the same time and through the same overt acts. We do not think such a construction of these sections is allowable. (Const., art. I, sec. 13; *French* v. *Teschemaker*, 24 Cal. 518; *People* v. *Curry*, 130 Cal. 94, [62 Pac. 516]; *People* v. *De Foor*, 100 Cal. 156, [34 Pac. 642]; *People* v. *Ny Sam Chung*, 94 Cal. 307, [28 Am. St. Rep. 129, 29 Pac. 642].) "It is a fundamental rule of law that out of the same facts a series of charges shall not be preferred." (*People* v. *Stephens*, 79 Cal. 430, [21 Pac. 856]; *People* v. *McDaniels*, 137 Cal. 194, [92 Am. St. Rep. 81, 69 Pac. 1006]; *People* v. *Williard*, 92 Cal. 488, [28 Pac. 585].) It is very evident from an examination of the two sections mentioned that it was the intent and purpose of the legislature to make offering to give, or giving, a bribe an offense, whether the legislator asked for and received it or not. And it seems quite as evident that it was never intended that persons concerned would be interchangeably guilty as accomplices, when the offer was accepted and the bribe received. In such event the giving would be the crime committed by one party, and the taking the crime of the other. As the only acts of these witnesses which could by possibility render them liable as principals under section 31 of the Penal Code constitute a separate and distinct offense under section 85, cardinal rules of construction forbid an interpretation which would also make them accessaries before the fact, or principals, in the commission of the other offense defined in section 86 of the same code. But there is another and much broader reason why the jury might reasonably find that neither Grange, McNab, Heins, Older, Russell, Tichenor, or Hartling were accomplices. "In every crime or public offense there must exist a union or joint operation of act and intent." (Pen. Code,

sec. 20; *People* v. *Hoagland,* 138 Cal. 341, [71 Pac. 359];
*People* v. *Welch,* 63 Cal. 168.) And it cannot be said that
the conduct of said witnesses, or any one of them, conclu-
sively establishes a criminal intent. The avowed purpose,
the employment of detectives, the general course pursued,
and the voluntary exposure of the whole affair, combine to
indicate the contrary.

It is next contended that the testimony of these witnesses
falls far short of that degree of corroboration required by
law. While corroborating evidence must create more than
a mere suspicion, it is not required that it be absolutely con-
vincing. Nor need it extend to every fact and detail cov-
ered by the statements of the accomplices. It is sufficient
if, standing alone, it tends to connect the defendant with
the crime. (*People* v. *Barker,* 114 Cal. 620, [46 Pac. 601];
*People* v. *Sternberg,* 111 Cal. 6, [43 Pac. 198]; *People* v.
*McLean,* 84 Cal. 482, [24 Pac. 32].) Here we find many
facts and circumstances tending directly to connect the de-
fendant with the crime. The meeting in the corridor of the
Senate was witnessed by Hartling. Both Hartling and
Tichenor corroborated the testimony of Jordan, not only as
to the meeting near the Clunie Opera-House, and the pay-
ment to appellant, but as to happenings, circumstances, and
conditions preceding and accompanying such meeting and
payment. Appellant, when testifying, admitted that he met
Jordan at the Senate chamber and near the opera-house, and
that he walked with the latter to the corner of Eighth and
K streets. His recollection was that the former meeting took
place in the morning and the latter in the evening on Mon-
day, while Jordan said they occurred in the afternoon and
evening on Tuesday. He also admitted that he met Jordan
the exact number of times, and approximately at the same
times and places, Jordan said he did, during that fateful
visit to San Francisco, and that French paid him a visit
about the time the final meeting was had between Jordan
and appellant before returning to Sacramento. He admitted,
too, that Jordan mentioned building and loan associations,
and expressed his interest in the investigation of such asso-
ciations. In short, he admitted everything which was done
openly, and only denied that which he might well think
had not been seen nor heard by others than Jordan. He

might reasonably anticipate contradiction as to that which was done openly and publicly, and nurse the hope that only one witness could contradict him as to that which was deemed privately and secretly accomplished. In any event, he could not admit the incriminating conversations and acceptance of the currency without danger of conviction, and these were in substance the only things he denied. When thus analyzed, in the light of a probable desire to screen himself from danger of contradiction as well as conviction, his own testimony lends strong support to that of Jordan. The foregoing review of the evidence discloses ample corroboration. (*People* v. *Bently,* 75 Cal. 409, [17 Pac. 436]; *People* v. *Cleveland,* 49 Cal. 577; *People* v. *Eldridge,* 147 Cal. 782, [82 Pac. 442]; cases cited, *supra.*) But uncontradicted evidence discloses facts full of significance in their tendency to prove what the corrupt agreement or consideration for the bribe actually was. It will be remembered that Jordan's testimony shows that appellant thought it would take ''big money'' to procure favor for the Continental Association, and that the declination of the Pacific led to a reduction of the amount originally agreed upon. Under these circumstances it probably seemed clear to the jury why these two associations were subjected to investigation, while the Phoenix and Renters' enjoyed the protection which Jordan says the money was paid to secure.

Appellant, however, contends that these facts, instead of lending aid to the case of the people, absolutely destroy such case, because it was necessary for the prosecution to show that the investigation of the Phœnix and Renters' associations was actually pending before this committee. We cannot concur in this view. It is clear from the evidence that the committee was engaged in a general investigation of similar institutions, and equally clear that the investigation of these two associations was a matter upon which appellant might be required to act in his official capacity. This was sufficient. (Pen. Code, sec. 86; *Application of Bunkers,* 1 Cal. App. 61, [81 Pac. 748].) It would, indeed, be singular if the very nonaction which the bribe was intended to secure could be held to constitute an impregnable barrier to the conviction of the briber and bribed.

The next claim is that it was error to admit the testimony of Jordan touching conversations between him and the appellant. Ordinarily this contention could be answered by citing a section of the code. (Code Civ. Proc., sec. 1870, subd. 2.) But it is said that Jordan and appellant were co-conspirators, and therefore proof of the conspiracy should have preceded such testimony. We do not understand that the rule invoked excludes acts and declarations of the accused, merely because the witness happens to be a co-conspirator. But, even if this proposition be conceded, the order of proof was discretionary, not mandatory, and as there is evidence in the record aside from Jordan's to show the relations between him and appellant we cannot say that the court erred in the course pursued. (*People* v. *Donnolly,* 143 Cal. 398, [77 Pac. 177]; *People* v. *Rodley,* 131 Cal. 253, [63 Pac. 351]; *People* v. *Compton,* 123 Cal. 408, [56 Pac. 44]; *People* v. *Eldridge,* 147 Cal. 782, [82 Pac. 442].)

It is said that the court erred in admitting evidence touching conversations between Jordan and Grange, and Jordan and Tichenor. Considerang the relations between appellant and Jordan, and the latter's connection with the bribery of the senators, we think such testimony was competent and pertinent. (*People* v. *Rodley,* 131 Cal. 253, [63 Pac. 351]; *People* v. *Gregory,* 120 Cal. 19, [52 Pac. 41]; *People* v. *Lovern,* 119 Cal. 91, [51 Pac. 22, 638]; *People* v. *Brown,* 59 Cal. 352; *People* v. *Geiger,* 49 Cal. 650; *People* v. *Cotta,* 49 Cal. 170.) Besides, this evidence and the evidence of the other witnesses examined in this connection was admissible to trace the money from its source to its destination, and to show that the witnesses were not accomplices. (*People* v. *Bolanger,* 71 Cal. 19, [11 Pac. 799]; *People* v. *Creegan,* 121 Cal. 557, [53 Pac. 1082]; *People* v. *Compton,* 123 Cal. 408, [56 Pac. 44]; *People* v. *Curlee,* 53 Cal. 607; *People* v. *Northey,* 77 Cal. 618, [19 Pac. 865, 20 Pac. 129]; *People* v. *Squires,* 99 Cal. 330, [33 Pac. 1092].)

The appellant insists that, if there was an absence of intent to bribe on the part of Grange and those acting in concert with him, there could be no bribery as to this defendant. Waiving the fact that the appellant was charged with asking for as well as receiving the bribe, we cannot see how the culpability of Grange et al., or the lack of it can minimize

the guilt of defendant. (*People* v. *Greening,* 102 Cal. 387, [36 Pac. 665].)

The final assault made upon the evidence is based on the ground that the plot to entrap these senators was reprehensible, if not criminal, and therefore the testimony of those implicated in it should have been rejected. We cannot be expected to lay down a code of ethics governing such transactions, and our inquiry will, therefore, be confined to the question whether the admission of such testimony is forbidden by express law or by rules of public policy.

The defendant stands convicted of one of the most dangerous crimes catalogued in the Penal Code. The murderer deprives an individual of life. The thief despoils a single citizen of property. The judge who forgets the sacred responsibility resting upon him can injure comparatively few by bartering his honor and violating his oath. But the venal legislator is a menace to the impartiality and probity of that system of law, which is the palladium of all rights pertaining to citizenship, and the foundation stone of public safety and security. This crime is secret in its nature, and as baneful as it is insidious in its effects. The social fabric could not long survive if its frequent commission was tolerated, and hence the preservation of our institutions, and the integrity of our system of government, demand that any tendency in that direction be sternly and effectually checked. The offer to receive a bribe, if satisfied, must lead to consequences as serious as they are evident, while a rebuff to the bribe seeker gives rise to dangers, born of resentment, which are scarcely capable of estimation. It is, therefore, highly important that a crime fraught with so much danger to the state, as well as to individuals, should be detected and punished. Recognizing the secrecy which usually attends its commission, the age and probable intelligence of those in a position to commit it, and the consequent difficulty of obtaining proof to bring the perpetrator to just punishment, it seems clear to us that a wise public policy must lend sanction to evidence obtained in the manner here assailed. No danger to the honest or innocent lurks in a rule upholding its competency under the circumstances here described. Honest law-givers do not wait for or seek temptation, nor do they withhold proper official action until interested parties can

be seen. True, neither the gravity of the crime nor considerations of public policy will warrant a departure from well-settled rules of evidence, but in this, as in most cases, public policy is seconded and sustained by law, for we believe this testimony was admissible under a rule of evidence long sanctioned by our highest court. The appellant was guilty of a crime when he asked for or offered to receive the bribe, and his acceptance of it neither added to his guilt nor to the penalty already entailed. Hence, the plan to ''entrap'' him amounted to nothing more than procuring corroborative evidence essential to conviction. Such methods, under these circumstances, are not within the rule against encouraging crime, merely to procure its commission, to the end that those willing to become offenders may be punished. They fall within that other rule which justifies dissemblance in order to procure additional and necessary evidence of guilt. (*People* v. *Squires,* 99 Cal. 330, [33 Pac. 1092] ; *People* v. *Northey,* 77 Cal. 632, [19 Pac. 865, 20 Pac. 129] ; *People* v. *Bolanger,* 71 Cal. 20, [11 Pac. 799] ; *People* v. *Farrell,* 30 Cal. 317 ; *People* v. *Greening,* 102 Cal. 387, [36 Pac. 665].)

Other assignments of error have been examined, but we are satisfied that no prejudicial error was committed in ruling on the admissibility of evidence. As most of the criticisms aimed at instructions excepted to are fully covered by the foregoing discussion touching evidence to which such instructions relate, it could serve no useful purpose to do more than review objections to instructions not included in this category.

The instructions as to ''feigned accomplices'' were not erroneous, for reasons stated in the cases last cited. The instructions relating to proof of acts which would warrant a verdict against the defendant were not erroneous. (*People* v. *Hall,* 94 Cal. 598, [30 Pac. 7] ; *People* v. *Thompson,* 111 Cal. 250, [43 Pac. 748] ; *People* v. *O'Brien,* 130 Cal. 3, [62 Pac. 297].) ''It is a well-settled rule that where a statute enumerates a series of acts either of which separately, or all together, may constitute the offense, all of such acts may be charged in a single count, for the reason that, notwithstanding each act may by itself constitute the offense, all of them together do no more, and likewise constitute one and the same offense.'' (*People* v. *Gusti,* 113 Cal. 178, [45 Pac.

2 Cal. App.—14

263]; *People* v. *Ellenwood,* 119 Cal. 166, [51 Pac. 553]; *People* v. *Eagan,* 116 Cal. 287, [48 Pac. 120].) Besides, an instruction that asking or receiving would justify a verdict of guilty could not have harmed appellant, for he was charged in the conjunctive, and the jury found him guilty as charged in the indictment. The instructions requested by the defendant and refused by the court were either erroneous or inapplicable or were fully covered by other instructions. The charge, read as a whole, was full, fair, and comprehensive, and the appellant certainly has no cause to complain that the law was not fully and clearly stated to the jury.

We do not deem it necessary to notice other errors assigned. Suffice it to say that we find no prejudicial error in the record.

The judgment and order are affirmed.

Chipman, P. J., and Buckles, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 15, 1906, and the following opinion was then rendered:

The COURT.—The application for a rehearing in this court, after decision in the district court of appeal for the third district, is denied. In denying such application, it is proper to say that the determination of the question as to whether one who gives a bribe can be an accomplice of the one who accepts the bribe is not essential to the decision in this case, and we are not to be understood as approving that portion of the opinion of the district court of appeal which deals with that question.