[No. 10034.  Department Two.  March 18, 1912.]

# The State of Washington, *Respondent*, v.
# C. W. Wappenstein, *Appellant*.[1]

Indictment and Information—Duplicity—Bribery. Under Rem. & Bal. Code, § 2321, making the soliciting and accepting of a bribe a felony, an indictment charging that the accused asked for, received and accepted a bribe is not duplicitous, since the act of soliciting and the act of accepting a bribe are not separate and distinct offenses, and may be laid conjunctively in a single count.

Criminal Law—Evidence—Declarations—Conversations in Absence of Defendant—Hearsay—Conspiracy. Under an indictment charging the defendant with having solicited and accepted bribes from two others under an agreement, understanding and promise to allow them to conduct houses of prostitution in violation of law, evidence of a conversation between the two in pursuance of the design, when the defendant was not present, is not objectionable as hearsay, where in connection with evidence of what took place in defendant's presence, it tends to establish the unlawful conspiracy, combination or agreement alleged in the indictment, and there was already sufficient evidence proper to go to the jury tending to establish the conspiracy.

Same. Such evidence was not inadmissible because of no prior consummated corrupt agreement or conspiracy, since it is immaterial at what time any one entered into the conspiracy, all being deemed parties to every act done in furtherance of it.

Same—Evidence of Conspiracy—Sufficiency. In a prosecution of a chief of police, there is sufficient *prima facie* proof of the fact of a conspiracy between him and two others, for the conducting of houses of prostitution in violation of law, to permit the introduction of evidence of the acts and declarations of the two when the defendant was not present, where it appears that the chief, just prior to taking office, had suggested to one of them that it would be the policy to open up such places, and that "all of us" could make some money thereby, and expressed a desire to meet the other conspirator and a meeting between them was arranged, and that some weeks prior thereto the two had agreed to rent such houses in case the city election resulted as it had.

Indictment and Information—Elements of Offense—Bribery—Evidence of Conspiracy—Admissibility. Where an indictment charges a chief of police with soliciting and accepting bribes from

[1]Reported in 121 Pac. 989.

two others, under an agreement, understanding and promise to permit them to conduct houses of prostitution in violation of law, the unlawful conspiracy is an essential element, though not the gravamen of the offense, making proof of the conspiracy essential to establish the crime, and such proof could be made in the same manner as if the conspiracy was the gist of the offense.

CRIMINAL LAW—EVIDENCE—ORDER OF PROOF—CONSPIRACY AS PART OF OFFENSE—ADMISSIBILITY. An objection that before the acts and declarations of the conspirators can be admitted in further proof of the conspiracy, there must be prior evidence *aliunde*, establishing *prima facie* the existence of the conspiracy, is one that goes only to the order of proof, which rests largely in the discretion of the trial court.

WITNESSES—IMPEACHMENT—DISCREDITING IMPEACHMENT. A witness having been impeached by his prior inconsistent evidence given before an investigating committee of the city council, may properly be allowed to explain that he at that time believed that the committee had no authority to put him under oath.

CRIMINAL LAW—EVIDENCE—OTHER CRIMES—INTENT—EVIDENCE—ADMISSIBILITY. In a prosecution of a chief of police for accepting bribes under a conspiracy with two others to conduct two certain houses of prostitution in violation of law, evidence that the defendant had sent the proprietors of other houses to the conspirators, and endeavored to interest them in the conduct of other houses, and that the defendant had interfered with the running of other houses not conducted by the conspirators, is admissible as tending to show the corrupt relations of the parties and guilty intent and at least slightly probative of the conspiracy.

CRIMINAL LAW—TRIAL—MISCONDUCT OF JUDGE—EXAMINATION OF WITNESS. Where, in a prosecution for soliciting and accepting a bribe, under a conspiracy with two others to conduct houses of prostitution in violation of law, a .witness who was the keeper of such a house had covertly insinuated that something said to him by the defendant had led him to go to one of the conspirators with money to bribe the defendant, and the witness was not frank in stating what had been said, it is not prejudicial misconduct on the part of the court to insinuate that the witness was not answering truthfully and admonish him to state the truth and what defendant had said, and to assume that something was said to him about going down and offering money, and that if the defendant had not said anything, to let the witness say so, where the purpose of the court was clearly either to kill the insinuation which the witness had made against the defendant or bring out the ground on which it was made; the result being that the witness denied that the defendant had said anything about money, and testified that he had

made an offer of money to a conspirator on his own initiative which offer was refused; since it was to the advantage of the defendant.

APPEAL—REVIEW—OBJECTIONS NOT PRESENTED BELOW. An objection that evidence should have been struck out cannot be urged on appeal where no motion to strike was made below.

BRIBERY—ACCEPTING BRIBE — EVIDENCE — SUFFICIENCY. There is sufficient evidence to sustain a conviction of a chief of police of soliciting and accepting bribes under an agreement with two others to allow them to conduct houses of prostitution, where the evidence of the two conspirators establishing the agreement and offense was corroborated by the fact of their securing and conducting two certain houses immediately thereafter, by the defendant's consent, and corroboration as to the payment of sums of money at various times, and the deposit of large sums by the defendant or members of his family.

CRIMINAL LAW—EVIDENCE—ACCOMPLICES—CREDIBILITY — CORROBORATION—NECESSITY. The fact that witnesses are accomplices goes only to their credibility, and a conviction may be sustained upon their uncorroborated testimony.

SAME—INTIMIDATION OF WITNESS—INDUCEMENTS. A conviction upon the testimony of accomplices cannot be objected to as secured by threats and intimidation of the witnesses or improper inducements held out to them, where it merely appears that the state had knowledge of other offenses committed by the witnesses, who hoped to better their position by telling all they knew, and were simply advised that, under the constitution, their evidence could not be used against them in any proceeding except for perjury in giving the evidence.

CRIMINAL LAW—TRIAL—INSTRUCTIONS—REASONABLE DOUBT. An isolated clause in an instruction to the effect that no reasonable doubt exists if the jury is "morally certain" about the matter is not prejudicial error, when the instructions as a whole clearly instructed as to the burden of proof, the presumption of innocence, the distinction between the *quantum* of proof in civil and criminal cases, and declared that a reasonable doubt is one that must arise from the evidence.

SAME—DISCREPANCIES IN TESTIMONY—CAUTIONARY INSTRUCTIONS. Cautionary instructions against being led afield by discrepancies and inconsistence in the evidence which have no bearing upon the main issue in the case are not erroneous as eliminating disputed and material facts, where the testimony was very voluminous and there was danger of the jury becoming hopelessly involved in a maze of collateral issues, and no fact was taken from the jury, the jury being told that they were the exclusive judges of the evidence and of its weight and the credibility of the witnesses.

CRIMINAL LAW—"ACCOMPLICES"— CONSPIRACY AS ELEMENT OF OTHER CRIME—PRINCIPALS AND ACCESSORIES—STATUTES. Where a chief of police was charged with soliciting and accepting bribes from two others under an agreement to permit them to conduct houses of prostitution in violation of law, the crime charged was that of accepting bribes, and not a conspiracy, and although proof of conspiracy was necessary as an element of the offense, it was not the offense charged; hence the conspirators were not accomplices, the offense of giving and offering a bribe being a distinct and separate offense from soliciting and accepting a bribe, under Rem. & Bal. Code, §§ 2320, 2321; and this, notwithstanding the provision of Id., § 2007, abolishing the distinction between principals and accessories, and § 2260 defining principals as all participants, as the sections are general and have no application to acts expressly designated as primary crimes in themselves.

Appeal from a judgment of the superior court for King county, Ronald, J., entered July 19, 1911, upon a trial and conviction of accepting a bribe. Affirmed.

*Morris & Shipley* and *Harold Preston*, for appellant.

*John F. Murphy, George H. Rummens,* and *H. B. Butler,* for respondent.

ELLIS, J.—The defendant was indicted for the crime of asking for, accepting, and receiving a bribe. The indictment charged that the defendant, being chief of the police department of the city of Seattle, asked for, accepted and received from Gideon Tupper and C. J. Gerald $1,000, as compensation, gratuity, reward and bribe, upon an agreement, understanding, and promise that he would thereby be influenced, governed, and controlled in the discharge of his official duty and action upon matters then pending which might be brought before him, and in consideration thereof and of that agreement, did, in violation of his official duty, permit and allow Tupper and Gerald, jointly or severally, to conduct, in violation of law, two houses of prostitution, designated as the "Paris House" and "The Midway," in the city of Seattle. A motion to quash the indictment was denied. A demurrer thereto was overruled. The defendant entered a plea of not

guilty, was tried, and the jury disagreed. A second trial was had resulting in a verdict of guilty. Motions for a new trial and in arrest of judgment were denied by the court. Judgment was entered and sentence imposed. From the judgment and sentence, this appeal was taken.

There are numerous assignments of error, but they are grouped under eight heads in the briefs, and will be so treated in this opinion.

(1) It is first contended that the demurrer to the indictment should have been sustained, in that it charged more than one offense. It is argued that Rem. & Bal. Code, § 2321, makes the act of soliciting and the act of accepting a bribe separate and distinct offenses. We find no support for this position. While the statute makes either of these actions sufficient to constitute the crime, they are but alternative constituents of the same statutory offense. They may be laid conjunctively in a single count and proof of either will sustain the charge.

"It is a well settled rule of criminal pleading that when an offense against a criminal statute may be committed in one or more of several ways, the indictment may, in a single count, charge its commission in any or all of the ways specified in the statute. So where a penal statute mentions several acts disjunctively and prescribes that each shall constitute the same offense and be subject to the same punishment, an indictment may charge any or all of such acts conjunctively as constituting a single offense." 22 Cyc. 380. See, also, *State v. Holedger*, 15 Wash. 443, 46 Pac. 652; *State v. Ilomaki*, 40 Wash. 629, 82 Pac. 873; *State v. Adams*, 41 Wash. 552, 83 Pac. 1108; *State v. Smalls*, 11 S. C. 262; *State v. Wynne*, 118 N. C. 1206, 24 S. E. 216; *People v. Gosset*, 93 Cal. 641, 29 Pac. 246; *State v. Beebe*, 115 Iowa 128, 88 N. W. 358; *State v. Marion*, 14 Mont. 458, 36 Pac. 1044; *Hale v. State*, 58 Ohio St. 676, 51 N. E. 154; *Cranor v. Albany*, 43 Ore. 144, 71 Pac. 1042; *State v. Donaldson*, 12 S. D. 259, 81 N. W. 299; *Boldt v. State*, 72 Wis. 7, 38

N. W. 177. No authority to the contrary has been cited. The demurrer was properly overruled.

(2) It is contended that the court erred in admitting testimony of Gerald as to conversation and transactions between himself and Tupper not in the presence of the defendant. Gerald had testified as to a conversation between himself and the defendant in which the defendant stated that it would be the policy to open up the restricted district; that the defendant had then said, "There will be a chance for all of us to make some money." That the witness had suggested to the defendant that he had a man he "wanted to get on down there;" that Tupper was the man; that defendant expressed a desire to meet Tupper; that arrangements were then made for a meeting between Tupper and defendant; that, a few days afterwards, the three met in Gerald's saloon, and the introduction took place; that the defendant then told Tupper to "go and get The Midway;" that Gerald then went away leaving Tupper and the defendant together. This was after announcement that defendant would be chief of police, but before he actually assumed that office. Gerald was then permitted, over objection, to testify that Tupper told him afterwards that he had secured The Midway; that he could also get the Paris House; that, as the witness remembered, Tupper told him that the defendant had instructed Tupper to get the Paris House; that Tupper said the defendant told him that he would have to pay to the defendant $10 for each woman; that the witness said to Tupper that "It was pretty strong, but I guessed he would have to stand for it;" that prior to that time an agreement was made between Gerald and Tupper to secure the crib houses and divide the proceeds of the business equally; that, after these conversations, Tupper paid Gerald his share once a month; and that, on making these various payments, Tupper told him that he, Tupper, had paid to the defendant "some months five hundred, sometimes six hundred or seven hundred . . . at the rate of ten dollars a woman."

It is first objected that this evidence should have been excluded. as hearsay. This is not tenable. It was admissible, together with the evidence of what took place in the defendant's presence, as tending to prove the unlawful agreement, combination, or conspiracy, alleged in the indictment as one of the elements of the crime charged. There was already evidence sufficient to establish *prima facie* an agreement to open and operate houses of ill-fame contrary to law, for gain. The antecedent agreement between Gerald and Tupper, the meeting of. Gerald with the defendant, the defendant's suggestion that there was a chance for all to make some money, Gerald's suggestion that he wanted to get Tupper "on down there," and the subsequent meeting of the three, and defendant's direction to Tupper to "get The Midway" could have no other meaning or purpose. The minds of the parties had met understandingly on the common design. The *conspiracy is the natural interpretation* of these events. There was thus already sufficient evidence proper to go to the jury tending to establish the conspiracy. It is well established that, where several have united together for an illegal purpose, any act done by one of them, or any of them, in prosecution of that common purpose or design, is, in the eye of the law, the act of all, and evidence of such act is admissible against all or any of them. The same is true of individual declarations touching the common design.

"The proof of conspiracy which will authorize the introduction of evidence as to the acts and declarations of the co-conspirators may be such proof only as is sufficient, in the opinion of the trial judge, to establish *prima facie* the fact of conspiracy between the parties, or proper to be laid before the jury, as *tending* to establish such fact." *Spies v. People*, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. 320.

"Upon this subject, Mr. Greenleaf has said: 'A foundation must first be laid by proof sufficient, in the opinion of the judge, to establish *prima facie* the fact of conspiracy between the parties, or proper to be laid before the jury as tending to establish such fact. The connection of the indi-

viduals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is therefore original evidence against each of them. It makes no difference at what time any one entered into the conspiracy. Every one who does enter into a common purpose or design is generally deemed, in law, a party to every act which had before been done by others, and a party to every act which may afterwards be done by any of the others in furtherance of such common design.' 1 Greenl. Ev. Sec. 111." *Card v. State*, 109 Ind. 415, 9 N. E. 591.

See, also, *McKee v. State*, 111 Ind. 378, 12 N. E. 510; *People v. McCann*, 247 Ill. 130, 93 N. E. 100; *United States v. Breese*, 173 Fed. 402.

The evidence complained of was admissible as primary evidence under the substantive law of conspiracy. It was not obnoxious to the rule against hearsay. Wigmore, Evidence, § 1797.

It is next urged that this evidence of the acts and declarations of Gerald and Tupper was inadmissible because there was no prior consummated corrupt agreement or conspiracy. What we have said of the prior objection effectually disposes of this. Gerald testified that he and Tupper had, some six weeks prior to the first conversation with the defendant, agreed with each other that if H. C. Gill was elected mayor they would rent crib houses for the purpose of prostitution, Tupper to be manager and Gerald a silent partner. After Gill's election, the conversations with the defendant took place. As we have seen, this evidence established *prima facie* a corrupt agreement. True, there was no evidence of a formally expressed agreement. Conspiracies are seldom susceptible of such proof. But there was evidence of a meeting of the minds, a unity of design, and a co-operation of conduct which could only mean that there was such an agreement. This was sufficient foundation for the admission of

evidence of subsequent independent acts and declarations of each of the parties as against any one of them.

"In one of its charges the court told the jury, in substance, that it was not essential to the formation of a conspiracy that there should have been any formal agreement between the parties to do the acts charged; that it would be sufficient if the minds of the parties understandingly met, so as to bring about an intelligent and deliberate agreement to do the acts and commit the crimes charged, although such agreement was not manifest by any formal words. The law was well and accurately stated in the foregoing charge, and the objections urged against it cannot prevail. Concurrence of sentiment and co-operative conduct in an unlawful and criminal enterprise, and not formality of speech, are the essential ingredients of criminal conspiracy." *McKee v. State, supra.*

See, also, *State v. Caseday* (Ore.), 115 Pac. 287; *State v. Thompson*, 69 Conn. 720, 38 Atl. 868; *Spies v. People, supra.*

It is argued that, if the conspiracy was not the crime charged, then the acts of the other conspirators were not admissible against the defendant. The conclusion does not follow the premise. The conspiracy was an essential element of the crime charged, a means to its commission, though not the gravamen of the offense. The conspiracy once *prima facie* established, the parties were so related in the common enterprise in connection with which the crime charged was committed, that the act and declarations of one in furtherance of the common design were admissible as against the others as those of a confederate. The fact that the defendant may have entered into the conspiracy as a means of committing the crime of accepting a bribe, which he alone could commit, would not change the rule of evidence as to the proof of the conspiracy. Since proof of the conspiracy was necessary to establish the crime as charged, that proof could be made in the same manner and by the same kind of evidence as if the conspiracy had been the gist of the offense charged. No logical reason to the contrary has been advanced.

As a third ground of objection, it is contended that, be-

fore acts or declarations of co-conspirators can be admitted in further proof of a conspiracy, there must be prior evidence *aliunde*, establishing *prima facie* the existence of the conspiracy. As we have seen, there was such prior evidence. Moreover, this objection goes only to the order of proof which, in cases where conspiracy is an essential element, is always a matter within the discretion of the trial court.

"On account of the difficulty in proving the conspiracy and bringing the guilty to justice there is no class of cases in which it is more important that the trial judge should have a large discretion as to the order in which evidence should be received, and this discretion cannot be reviewed on error except in clear cases of abuse. It is frequently said that the acts and declarations of one conspirator cannot be admitted in evidence against his fellow conspirators until proof has been made of the existence of the conspiracy. There is, however, no unvarying rule to this effect. According to the great weight of authority the order in which the testimony shall be received is largely in the discretion of the trial court. If the circumstances of the case are so peculiar and urgent as to require it, the acts and declarations of a conspirator may be introduced in the first instance before proof of the agreement." 8 Cyc. 682.

See, also, *People v. Saunders*, 25 Mich. 119; *State v. Thompson, supra; State v. Miller*, 35 Kan. 328, 10 Pac. 865; *State v. Jackson*, 82 N. C. 565; *Luttrell v. State*, 31 Tex. Cr. 493, 21 S. W. 248; *Harris v. State*, 31 Tex. Cr. 411, 20 S. W. 916; *Drake v. Stewart*, 76 Fed. 140; *Spies v. People, supra*. Neither of the objections urged was well taken. The evidence complained of was properly admitted.

(3) The state's witness Gerald, in explanation of prior statements made before an investigating committee of the city council inconsistent with his testimony at the trial, was permitted to testify, in effect, that he then believed the committee had no authority to put him under oath. It is urged that this was error in that it was an attempt to weaken the effect of the impeachment. We think this was permissible.

That is the purpose of every explanation of conflicting statements. The witness having admitted the prior contradictory statements, it was not error to permit his giving as a reason therefor that he then did not consider himself under a binding oath. Evidence of the circumstances, state of mind, and what was intended to be accomplished by the prior statement, is always admissible, whether tending to sustain or to discredit it. *Wheeler v. Buck & Co.*, 23 Wash. 679, 63 Pac. 566.

(4) It is contended that the court erred in admitting evidence as to collateral matters and circumstances relating to other houses than the Midway and the Paris, and other persons than Gerald and Tupper. Under this contention, it is first urged that the court erred in admitting testimony of Tupper tending to show that the defendant sent one Long to him with a view to opening other houses of prostitution; that Tupper refused to talk to Long, and afterwards told the defendant that he did not know Long and wished the defendant would not send Long to him; that defendant told Tupper he would give him an interest with Long which offer Tupper refused. It is argued that this tended improperly to extend the conspiracy alleged in the indictment to other houses or proprietors. The manifest purpose and tendency of this evidence was to show the corrupt relations existing between Tupper and the defendant, and the criminal intent of these relations on defendant's part. The fact that it further tended to show a willingness on the defendant's part to extend those relations to others did not render it inadmissible.

"Where the guilt of a party depends upon the intent, purpose, or design with which an act is done, or upon his guilty knowledge thereof, collateral facts in which he bore a principal part may be examined into for the purpose of establishing such guilty intent, design, purpose or knowledge. It is sufficient that such collateral facts have some connection with each other as a part of the same plan or as induced by the same motive, and it is immaterial that they show the commission of other crimes. The evidence in a conspiracy is wider

than perhaps in any other case. Taken by themselves, the acts of a conspiracy are rarely of an unequivocally guilty character, and they can only be properly estimated when connected with all the surrounding circumstances." 8 Cyc. 684. See, also, *State v. Craddick*, 61 Wash. 425, 112 Pac. 491; *People v. Peckens*, 153 N. Y. 576, 47 N. E. 883; *Card v. State*, 109 Ind. 415, 9 N. E. 591; *State v. Lewis*, 96 Iowa 286, 65 N. W. 295; *State v. Ames*, 90 Minn. 183, 96 N. W. 330; *People v. Ruef*, 14 Cal. App. 576, 114 Pac. 48, 54; *Commonwealth v. Stuart*, 207 Mass. 563, 93 N. E. 825; *Joyce v. State*, 88 Neb. 599, 130 N. W. 291.

A cognate contention is advanced as to the testimony of one John Armin as to an interview of Armin and Long with the defendant. Armin owned a house called the Big Casino, which he testified was tenanted by "sporting girls." The house was managed by Long. About thirty days after the defendant assumed the office of chief of police, the back entrance to this house was closed. Armin and Long went to see the defendant about it and the defendant had said: "What are you fellows trying to do, run a bargain counter; if you fellows can't agree I am going to shut up the houses down there." They then went away, the defendant having instructed Long to come and see him again. This evidence, so far as it had any bearing, tended to show an interference with other houses of ill-fame than those operated by Gerald and Tupper. So far as it had that tendency, it was material as at least slightly probative of the agreement between the defendant and Gerald and Tupper. It had no other purpose or tendency, and the defendant was in no manner prejudiced by its admission.

Long testified concerning this and other interviews had by him with the defendant when Armin was not present, stating that the defendant told him to see Tupper about connecting the "Big Casino" with the "Midway" by a bridge across the alley; also, about fixing the amount of rents, apparently

meaning what rents the inmates of the houses should pay. He also testified as follows:

"Q. Well, did he tell you to see Tupper? A. Yes. Q. And did you see Tupper in accordance with the orders given you by Wappenstein? A. Yes. Q. What did you say to him? A. I told Tupper that I wanted to do what the rest were doing, if the rest were paying, I wanted to pay. Q. What did Tupper say to you, if anything? A. Tupper says that he wouldn't take any money at all; he kind of turned me down, turned me shortly."

After some evasion by the witness, the following colloquy took place:

"The court: Let him answer again. A. I told Tupper that Mr. Wappenstein sent me to him to see him about the business but he never told me to go to him about money. Q. But you did go to him with money to pay Wappenstein? A. Yes. By the Court: Q. Did Wappenstein tell you to go to him about business? A. Yes; but not about money. Q. I want to know the truth, what was Wappenstein's language when he said that? A. As I told you, he told me to go once and see about rents, and about the alley, and about fixing the bridge. He never come right out and said about going to see him about money. Q. By Mr. Murphy: Well, did he about business? A. Well, the way I figured it— The court: Now, what did he say to you, Mr. Long, I want to know what he said? A. I am telling what he said. Q. You are not telling it truthfully then. A. He has asked about different conversations. Q. What was said to you about going down there and offering money to Tupper? What did Wappenstein say to you that caused you to do that? A. Nobody told me to go and see him about giving him money. Q. That isn't answering my question. What had Wappenstein said that caused you to go and make that proposition to Tupper? Mr. Morris: Your honor, you are assuming. The court: Yes, I am assuming. If Wappenstein didn't say anything to him, let him say so. A. Wappenstein never said anything about going to see him about money."

It is contended by counsel that the court committed prejudicial error in assuming that the witness was not telling the

matter truthfully. While under most circumstances such a remark would be held prejudicial, it was plainly not so in this instance. The witness, as shown by the testimony quoted, and much more of the same character, had covertly insinuated that something said by the defendant had led him to go to Tupper "with money to pay Wappenstein." This, without further light, would have been extremely prejudicial to the defendant. It was obvious that the witness was not frank. The court's remark, though unfortunately worded, was no more than an admonition to speak out frankly. Neither the jury nor any one else could have understood it differently, in view of the prior insinuation of the witness. That the court had in mind fairness to the defendant, as well as to the state, was made plain by his statement, "Yes, I am assuming. If Wappenstein didn't say anything to him, let him say so." We cannot hold that an admonition, to a manifestly disingenuous witness, to be frank, though incautiously worded, will constitute ground for reversal, when, as in this instance, the purpose of the court was plain to either kill the insinuation or bring out the ground upon which it was made. The admonition, even worded as it was, was certainly much less damaging to the defendant than the evasive testimony would have been had it passed unchallenged by the court. After this incident, the court directed the jury to withdraw, and in its absence admonished the witness to state his grounds for offering money, and explained his attitude to the witness and counsel:

"The court: I am simply instructing this witness. This court is here for the truth, and I want the truth. I don't want this witness to be intimidated by the court. The court believes that he made that proposition to Tupper. Now, then you had some reason for making that proposition, and if that reason grew out of anything the chief told you, I want to know it. If it didn't grow out of anything the chief told you, I want to know it. I don't propose to let any witness conceal anything that is true and volunteer anything that is not true."

On the return of the jury, the witness again stated, "Yes Mr. Wappenstein sent me to Mr. Tupper; but as I said before not regarding money. He sent me to Mr. Tupper but not regarding money." And on cross-examination, the witness stated, in effect, that he went to Tupper with money on his own initiative. It is obvious that the court's admonition was of distinct advantage to the defendant. The supreme court of Iowa, in passing upon a similar incident, very recently used the following language:

"Among the witnesses produced on the trial was one of the young women referred to in the indictment. While being examined by counsel for the state, she was sharply reprimanded by the court, and warned that she must answer the questions propounded to her, and tell the truth. Of this the appellant vigorously complains, and says that it was in effect a suggestion to the jury that defendant was guilty, and that the witness was testifying falsely. It is quite evident from the record that the witness was testifying with reluctance, and frequently indulged in the answer, 'I don't remember,' and the court appears to have believed that she was evading the inquiries made of her. We are unable to say that the rebuke was not justified. The witness was before the court, which could observe her appearance, conduct, demeanor, and tone, and if these warranted the conclusion that she was not speaking frankly or fully of the matters inquired about it was within the province of the court to interfere and remind the witness that she was under oath, and must tell the truth, and the whole truth. There is nothing in the record to indicate that this discretion was abused." *State v. Poder* (Iowa), 132 N. W. 962, 963.

We find no prejudicial error in this incident. Counsel contends that the testimony of this witness should have been stricken, but as no such request was made, that question is not before us.

(5) The next contention is that the court erred in denying the defendant's motions for a directed verdict and a new trial. The grounds advanced are that the evidence was not sufficient to sustain the verdict, and that there was no evidence corroborating that of Gerald and Tupper, who it is

claimed were accomplices. An examination of the evidence makes it clear to us that neither ground is tenable. At the risk of prolixity, we will touch upon the salient points of the evidence adduced by the state. The testimony of Gerald, Long and Armin has already been sufficiently reviewed. Tupper testified that Gerald introduced him to the defendant as "The fellow that he had been talking about;" that between the two, Gerald and the defendant, and when all three were present, Tupper was told to go and get the Midway; that this conversation took place after the announcement that the defendant would be chief of police, but before he assumed the duties of that office; that, in pursuance of this conversation, Tupper did secure a lease of the Midway; that on the same day, March 21, 1910, on which the defendant assumed the office of chief of police, Tupper opened the Midway as a house of prostitution. One Hedges, a police sergeant, testified that on that day he was informed by a policeman on that beat that women were going into the Midway, which was the largest house of prostitution in the district; that he investigated and found it true and reported that fact to the defendant who said, "It was all right," and that it was the intention to assemble all prostitutes in the restricted district. Tupper further testified that, after this, Gerald and the defendant suggested that Tupper get another house; that he consulted the defendant about securing the Paris House near the Midway; that one Nichols who had control of that property at first declined to let him have it, questioning his responsibility, and that Tupper referred him to Gerald and the defendant; that he, Tupper, went to the defendant and told him that Nichols would not let him have the house, claiming that he did not know whether Tupper was responsible or not, and that the defendant would have to see about it "so he said he would fix it and see what he could do;" that the next time he saw Nichols he said it was all right, and as a result the "Paris House" was secured, and also opened as a house of prostitution. Tupper further tes-

tified that he had a talk with the defendant soon after open-
ing the Paris House relative to payment for the privilege of
running the houses; that the defendant said the landlords
used to pay $10 a month for each woman to the city as a
fine, that he did not know whether there was going to be
any fine, and he would accept that, that it ought to be worth
that. "He thought it wasn't too much. He thought he
was entitled to that much, ten dollars a person;" that, in
pursuance of this agreement, Tupper made his first pay-
ment after the first of May, and thereafter up to August
5th he paid generally soon after the first of the month; that
he made these payments to the defendant personally in the
office of the chief of police; that he would take currency
when the time came and give it to the defendant; that as a
rule Tupper went to the bank and got the currency on his
personal check. That on August 5, he drew a check for
$1,245, got the money on it in large bills, went to the office
of the defendant and paid him $1,000 as the monthly pay-
ment at the rate of ten dollars for each woman of the Mid-
way and Paris Houses.

In corroboration of Tupper, the paying teller of the bank
where Tupper kept his account testified that Tupper, at
various times, made requests for large bills, and that, on
August 5, 1910, Tupper drew his check for $1,245. The
evidence also showed that the defendant deposited the sum
of $1,000 on that day, August 5, 1910, in the Canadian Bank
of Commerce where he kept his bank account. There was
evidence that the health department kept an account of the
number of fallen women in the district, and that the police
department also kept a record made from actual count, and
that the record for the month of August, 1910, made on
July 30, showed 101 inmates of the Midway and Paris
Houses. The bookkeepers of the Midway and Paris Houses
testified that at various times Tupper held out large sums of
money, directing that they be entered as expenses in addi-
tion to the ordinary itemized running expenses of the house.

The evidence showed that the appellant, prior to becoming chief of police, had a safety deposit box in the Seattle Safety Deposit Vaults, as did also his wife; and that these were retained, and his wife also had access to the defendant's box; that on July 12, 1910, he rented a safety deposit box from another institution, which he thereafter visited frequently, and that he and his brother-in-law, one E. B. Benn, visited this box on the morning of February 15, 1911; that the defendant visited the first mentioned box only a few times while he was chief of police; that his wife, on Feb. 15, 1911, shortly after it was announced that a grand jury would be called and shortly before it actually convened, visited this box; and afterwards on the same day there was deposited to her credit in the Canadian Bank of Commerce $5,000, all in currency, and in the Seattle National Bank, apparently to the credit of defendant's brother-in-law, E. B. Benn, the sum of $5,000, all in currency excepting $600 in gold. Benn testified that all of this money belonged to one Samuel Benn and not to the defendant. The testimony of Gerald and Tupper was contradicted by the defendant, and explanations were offered for most of the damaging circumstances. The weight and credibility of all of the evidence was for the jury.

The foregoing makes it plain that the testimony of.Tupper and of Gerald was not without corroboration, at least by many circumstances tending to support its truth and to connect the defendant with the crime charged. Moreover, as we shall see, these witnesses were in no legal sense accomplices. In any event, this court has never adopted the stringent rule that uncorroborated testimony of an accomplice will not support a conviction. The fact that witnesses are accomplices goes only to the credibility of their testimony. Lack of corroboration is not alone sufficient to warrant an interference with the verdict of the jury founded upon such evidence. We have but recently expressed what we conceive to be the true rule.

"We are not at all satisfied that the evidence establishes

the fact that they were accomplices in the crime with such degree of certainty as to enable us to say, as a matter of law, that they were such; but, conceding that they were accomplices, their credibility is affected only by that fact, together with the fact that they denied knowledge of the cause of the miscarriage, and made some statements immediately thereafter inconsistent with their testimony. We assume that their testimony was not corroborated, in so far as it related to appellant's connection with the crime. We have heretofore recognized the rule that the testimony of accomplices, without corroboration, may be sufficient to support a conviction. *State v. Jones*, 53 Wash. 142, 101 Pac. 708; *State v. Ray*, 62 Wash. 582, 114 Pac. 439. So the want of corroboration alone is not sufficient to warrant our interference with the finding of guilt by the jury." *State v. Stapp*, 65 Wash. 438, 118 Pac. 337.

Much argument was advanced in an effort to show that the testimony of Gerald and Tupper was influenced by threats or intimidation, or by some promise by the prosecuting attorney and the detective Burns of immunity from prosecution from other unlawful enterprises in which they were involved. An examination of the evidence discloses little more than that these men knew they were liable to prosecution for other offenses, and knew that the prosecuting attorney and the detective had knowledge of these matters. What took place in the different interviews between these witnesses and the attorney and the detective was fully brought out on cross-examination. The evidence fails to show that their testimony was induced by threats or intimidation. Nor was there any promise of immunity further than a reading to Tupper of § 30 of article 2 of the state constitution, which is in part as follows:

"Any person may be compelled to testify in any lawful investigation or judicial proceeding against any person who may be charged with having committed the offense of bribery or corrupt solicitation, or practice of solicitation, and shall not be permitted to withhold his testimony on the ground that it may criminate himself or subject him to public infamy, but such testimony shall not afterwards be used against

him in any judicial proceeding, except for perjury in giving testimony."

While these witnesses in their own minds may have hoped, and doubtless did hope, to place themselves in a better position with the authorities by making a clean breast of the bribery matter, and were advised that their evidence could not be used against themselves, the evidence fails to show that any improper influence was brought to bear as an inducement to their testimony.

There was evidence proper to go to the jury and tending to establish every element of the crime charged in the indictment. The weight and credibility of this evidence was for the jury. The trial court did not feel warranted in directing a verdict for the defendant nor in granting a new trial. In such cases, we have uniformly declined to interfere. To do so would be a plain usurpation of the functions of the jury.

"It is difficult to formulate a general rule stating the extent to which appellate courts will pass upon the weight and sufficiency of evidence and reverse because of an insufficiency of evidence, but the general rule seems to be that where there is material evidence tending to prove defendant's guilt before the jury, and the trial court refuses to set their verdict aside, an appellate court will not reverse the action of both the trial court and the jury; that it will examine the record to see whether there is evidence proper to go to the jury, and upon which a verdict of guilt might reasonably be founded, and, being satisfied on that point, will refuse to interfere, whatever may be its own opinion of the weight or preponderance of the evidence. If, however, the verdict of the jury is altogether unsupported by any evidence whatever, or if it is against the evidence and every proper inference which is reasonably deducible therefrom, the judgment will be reversed by the appellate court." 12 Cyc. pp. 906, 907, 908.

See, also, *State v. Bailey, ante* p. 336, 121 Pac. 821; *State v. Bailey,* 31 Wash. 89, 71 Pac. 715; *State v. Murphy,* 15 Wash. 98, 45 Pac. 729; *State v. Kroenert,* 13 Wash. 644, 43 Pac. 867; *State v. Coates,* 22 Wash. 601, 61 Pac. 726;

*Miller v. Territory*, 9 Ariz. 123, 80 Pac. 321; *Kennon v. Territory*, 5 Okl. 685, 50 Pac. 172; *People v. Fitzgerald*, 138 Cal. 39, 70 Pac. 1014; *Mow v. People*, 31 Colo. 351, 72 Pac. 1069; *People v. Williams*, 133 Cal. 165, 65 Pac. 323.

(6) It is contended that the instruction given by the court defining reasonable doubt was erroneous. The instruction as a whole was as follows:

"The burden is on the state, and in order to convict, the state must satisfy you beyond every reasonable doubt that the defendant accepted from Tupper, about the time mentioned, some amount of money as a reward or bribe as herein defined.

"Under our law, a person accused of crime is presumed to be innocent, and he is entitled to the benefit of this presumption throughout this trial until the same shall have been removed or overcome by proof of guilt beyond every reasonable doubt.

"Now what is reasonable doubt? When is a doubt a reasonable doubt? Failure of jurors to understand this term sometimes results in conviction on insufficient evidence, and sometimes results in acquittal in spite of ample proof of guilt.

"It is not enough that the state satisfy you by a mere preponderance of the testimony; that is, it is not enough that you shall believe from the evidence that in all probability the defendant is guilty. That is the rule in civil cases; but while you may believe the defendant in a criminal case to be in all probability guilty, yet there may be a reasonable doubt in your mind. On the other hand, a reasonable doubt does not mean a vague, conjectural doubt or a misgiving founded upon some mere possibility. You should understand and distinguish the difference between proof beyond a reasonable doubt and proof to the exclusion from the mind of a mere vague, imaginary or possible doubt. The state is not required to satisfy you of guilt so conclusively and to such an absolute certainty that there is no possibility of any mistake whatever. But when you are morally satisfied, then you are satisfied beyond a reasonable doubt. You may be satisfied of a fact beyond every reasonable doubt and yet not satisfied to an absolute certainty. You may have no reasonable doubt in your mind of the truth of a matter, and yet

there may be a possibility that such matter is not true. Very few facts in the domain of human knowledge are susceptible of proof to an absolute certainty. Look carefully in your own mind and if you can say 'I have no reasonable doubt about such matter, I am morally certain of its truth,' then you should act upon your conviction of such being the truth, notwithstanding the mere possibility that you may be mistaken.

"Hence, you note a reasonable doubt is one that must arise from the evidence in the case, and must be such a substantial one as an honest, sensible and fair-minded man might with reason entertain consistently with a conscientious desire to ascertain the truth. Use your common sense as men of experience possessing some knowledge of human nature and of worldly affairs, and if after examining carefully all the facts and circumstances in this case you cannot say and feel that you have a settled and abiding conviction of the guilt of defendant, then you have a reasonable doubt and should acquit; if you have such conviction, then you have no reasonable doubt, and should convict."

Counsel's objection to this instruction is elusive. It is directed mainly to isolated sentences, particularly the following: "But when you are morally satisfied, then you are satisfied beyond a reasonable doubt," and "Look carefully in your mind and if you can say 'I have no reasonable doubt about such matter, I am morally certain of its truth,' then you should act upon your conviction of such being the truth," etc. The apparent contention is that this language would allow the jury to determine the question of reasonable doubt or the contrary "without any reference to evidence or lack of evidence." A reading of the whole instruction is sufficient to refute this view. The court having first instructed clearly as to burden of proof, the presumption of innocence and the difference in the rule as to the quantum of proof in civil and criminal cases, followed the language complained of with the plain statement that "a reasonable doubt is one that must arise from the evidence," and in effect that, whatever the conclusion reached it must rest upon "all the facts and circumstances in this case." While the sentences complained of

would doubtless be prejudicially erroneous standing alone, they cannot be so held when taken in connection with the remainder of the instruction. It is hardly practicable to include every element of a charge in a single sentence. It is sufficient if the instruction as a whole fairly states the law. We have so often so held that citation of authority seems unnecessary.

No profit would result from a review of the numerous authorities cited in this connection, since some of them indulge a refinement of criticism almost scholastic and none of the instructions considered is couched in the same or language equivalent to that here under examination save one. In *Gorgo v. People*, 100 Ill. App. 130, which is cited by appellant with approval, the instruction was as follows:

"A reasonable doubt is that state of mind which, after a full consideration and comparison of all the evidence, both for the state and the defense, leaves the minds of the jury in that condition that they can not say that they feel an abiding faith, amounting to a moral certainty, from the evidence in the case, that the defendant, Vito Gorgo, is guilty of the charges as laid in the indictment. If you have such a doubt, if your conviction of the defendant's guilt, as laid in the indictment, does not amount to a moral certainty from the evidence in this case, then the court instructs you that you must acquit the defendant, Vito Gorgo."

It will be noted that this instruction does not differ materially from the instruction here questioned except in the position therein of the reference to the evidence. The two instructions contain substantially the same elements expressed in different language and in different arrangement. See, also, *State v. Harsted*, 66 Wash. 158, 119 Pac. 24, in which case we approved an instruction essentially the same as that here considered. The instruction is not objectionable because it uses the words "morally certain" as equivalent to "beyond a reasonable doubt." That these terms are legal equivalents of each other is supported by ample authority. *Gorgo v. People, supra; Jones v. State*, 100 Ala. 88, 14

South. 772; *Miles v. United States*, 103 U. S. 304; *Commonwealth v. Webster*, 5 Cush. 295, 52 Am. Dec. 711; *Territory v. Owings*, 3 Mont. 137; *Hornsby v. State*, 94 Ala. 55, 10 South. 522; *People v. Cheong Foon Ark*, 61 Cal. 527; *Loggins v. State*, 32 Tex. Cr. 364, 24 S. W. 512.

(7) It is also contended that the court committed error in giving the following instruction:

"If you should find that there are discrepancies or inconsistencies existing in the testimony of any witness, or between the testimony of any witnesses, or if you should find yourselves disagreeing over various issues, real or apparent, you should then ascertain whether or not such discrepancies or inconsistencies, or such points of difference, affect the main issue in this case. Examine such discrepancies or inconsistencies and such disputed points; look at the same squarely, and ask yourselves these questions: How does the decision of this, or that, or the other discrepancy, or matter in dispute, affect the main issue in this case? Regardless of what may be the truth of such discrepancy or issue, did or did not the defendant accept a bribe from Tupper and Gerald? Is such discrepancy or such disputed point material to establish this main and material fact? If they are not material, if the decision of the same is not necessary to enable you to arrive at the truth of this main issue, then such discrepancies or disputed points are immaterial and minor matters, and do not waste further time in discussing or considering them. Spend no time in the discussion of minor matters which, whether true or false, do not affect and are not necessary to enable you to answer the important question: Did defendant accept a bribe from Tupper and Gerald?"

It is argued that this instruction tended to eliminate from the consideration of the jury many disputed and material facts. We think not. The purpose of the instruction was plain. It was a mere caution to the jury against being led afield and unduly influenced by discrepancies or inconsistencies which had no bearing upon the main issue in the case, namely, the guilt or innocence of the defendant. They were instructed to examine each discrepancy with that issue in view. The testimony in this case is very voluminous. In

such a case, there is always danger of the jury becoming hopelessly involved in a maze of collateral issues. A caution to examine every discrepancy, inconsistency, and disputed point with a view only to its bearing upon the real issue, and to waste no time upon any such matter when found immaterial to that issue, was entirely proper. It took no fact from the jury. The jury was told to examine every such discrepancy or inconsistency till it was found immaterial. In prior instructions the court had clearly defined the issue. In a subsequent instruction the jurymen were told that they were the exclusive judges of the evidence, of the credibility of the witnesses and of the degree of weight to be attached to their testimony, and to give to the testimony of every witness just such weight or value as they might think it entitled to. The instruction complained of, taken in connection with the others given, was not objectionable.

(8) Finally, it is contended that the court erred in refusing to give instructions requested by the defendant as to the weight to be given to the testimony of an accomplice and as to the necessity for corroboration of such testimony. These requests were based upon an assumption that Gerald and Tupper were accomplices of the defendant in the commission of the offense charged. They were not accomplices within the legal significance of that term. The appellant was charged with accepting a bribe from Gerald and Tupper, and as an element of the offense, the corrupt agreement between the three was alleged. The corrupt agreement itself constituted an independent crime, that of conspiracy. If the defendant had been indicted for conspiracy, then Gerald and Tupper would have been accomplices in that crime. The conspiracy, however, was not a conspiracy to bribe an officer but to conduct houses of prostitution in violation of law. While proof of the conspiracy was necessary as an element of the offense as charged, it was not the offense charged. The gravamen of the offense was soliciting and accepting a bribe. The giving or offering of a bribe, and the soliciting or re-

ceiving of a bribe, are two distinct crimes, defined and made punishable by separate sections of the statute. These sections, so far as here material, are as follows:

"Every person who . . . shall give, offer or promise, directly or indirectly, any compensation, gratuity or reward to a person executing any of the functions of a public officer other than as hereinbefore specified, with intent to influence him with respect to any act, decision, vote or other proceeding in the exercise of his powers or functions, shall be punished by imprisonment in the state penitentiary for not more than ten years, or by a fine of not more than five thousand dollars, or by both." Rem. & Bal. Code, § 2320.

"Every executive or administrative officer or person elected or appointed to an executive or administrative office who shall ask or receive, directly or indirectly, any compensation, gratuity or reward, or any promise thereof, upon an agreement or understanding that his vote, opinion or action upon any matter then pending, or which may by law be brought before him in his official capacity, shall be influenced thereby; . . . shall be punished by imprisonment in the state penitentiary for not more than ten years, or by a fine of not more than five thousand dollars, or by both." Rem. & Bal. Code, § 2321.

The prosecution was based upon the latter of these sections, and it is plain that neither Tupper nor Gerald could have been indicted under that section or for the crimes therein defined, either as principal or accessory. This is obvious, since the section applies only to public officers, and the statute itself in the prior section has declared the acts of which Tupper and Gerald were guilty to constitute a separate and distinct crime. The true test to determine whether a witness is an accomplice or not is, Could the witness himself have been indicted, either as principal or accessory, for the crime charged and under investigation? If he could not, he is not an accomplice. Manifestly, under that test, Tupper and Gerald were not accomplices; neither had received a bribe; neither was a public officer. The supreme court of Minnesota, in passing upon this exact ques-

tion, and in connection with a crime charged under a statute containing sections closely analogous to those above quoted has so held. (Minnesota Statutes 1894, §§ 6349, 6355, embodied in a modified form in Revised Laws of Minnesota 1905, §§ 4799, 4800.) In *State v. Durnam*, 73 Minn. 150, 75 N. W. 1127, it appeared that Durnam was indicted for soliciting a bribe from one Richards with the understanding that Durnam's vote as a member of the city council would be influenced thereby. The court said:

"The court refused to give to the jury certain requested instructions upon the proposition that a conviction cannot be had upon the uncorroborated testimony of an accomplice. These requests were made upon the theory that Richards, or both Richards and Halvorson, were accomplices of the defendant in the commission of the offense charged, or at least that there was evidence tending to prove that fact. If there is any evidence tending to implicate Halvorson or Richards, even morally, with the crime charged, the most that can possibly be claimed for it is that it tended to prove that they were inclined to entertain defendant's demand favorably, and would have been willing to accede to it if the sum demanded had not been so large.

"Even if they had fully acceded to defendant's demand, and had paid or offered to pay the sum demanded, although they would have been guilty of an independent and separate crime, they would not have been, within the meaning of the law, accomplices of the defendant in the commission of the crime of asking for a bribe. An accomplice in legal signification, is one who co-operates, aids or assists another in the commission of a crime, either as principal or accessory. The general test to determine whether a witness is or is not an accomplice is, could he himself have been indicted for the offense either as principal or as accessory? If he could not, then he is not an accomplice. *Com. v. Wood*, 11 Gray 85. Each of the two parties to a transaction may be guilty of a crime, and yet, if the two crimes are separate and distinct crimes, the one is not the accomplice of the other. Thus, suppose A. asks B. for a bribe, and B. pays it. A. is guilty of the crime of asking a bribe, and B. of the crime of giving one. But the two crimes are entirely distinct, and neither party could be indicted, either as principal or accessory,

for the crime committed by the other. Such a case would not be within the statute forbidding a conviction on the uncorroborated evidence of an accomplice, although, of course, the moral delinquency of either, if called as a witness against the other, would be a fact going to his credibility, which a jury should take into consideration."

In *People v. Bunkers*, 2 Cal. App. 197, 84 Pac. 364, 370, similar statutory provisions are construed in the same way. Section 86 of the penal code of California punished as a crime the asking for or receiving of bribes by members of the legislature. Section 85 punished as a crime the giving of a bribe. The question was, Were the witnesses, the persons furnishing the bribe money to a go-between, accomplices? The court said:

"It is very evident from an examination of the two sections mentioned that it was the intent and purpose of the legislature to make offering to give, or giving, a bribe an offense, whether the legislator asked for and received it or not. And it seems quite as evident that it was never intended that persons concerned would be interchangeably guilty as accomplices, when the offer was accepted and the bribe received. In such event the giving would be the crime committed by one party, and the taking the crime of the other. As the only acts of these witnesses which could by possibility render them liable as principals under section 31 of the penal code constitute a separate and distinct offense under section 85, cardinal rules of construction forbid an interpretation which would also make them accessories before the fact, or principals in the commission of the other offense defined in section 86 of the same code."

See, also, *People v. Ruef*, 14 Cal. App. 576, 114 Pac. 48.

Analogous situations are found in the following cases. Where, by separate sections of the statute, buying lottery tickets and selling lottery tickets are made separate crimes, the buyer is not an accomplice of the seller. *Boyd v. Commonwealth*, 141 Ky. 247, 132 S. W. 423. In the absence of a statute requiring corroboration in such cases, where by one section of the criminal code the performing of an abor-

tion is made an offense, and by another section it is made a different crime for the woman to submit to the act, the woman is held not an accomplice of the person actually performing the operation. *People v. Meyers*, 5 N. Y. Cr. Rep. 120; *State v. Stafford*, 145 Iowa 285, 123 N. W. 167. "The woman upon whom the attempt is made with her consent is not an accomplice in such sense that her testimony requires corroboration; but the woman may be an accomplice in such sense that her admissions or declarations are admissible against the defendant as those of a confederate." 2 Mc-Lain, Criminal Law, § 1151. So, also, it has often been held that in prosecution for the unlawful sale of liquor, the person who buys at such illegal sale is not an accomplice of the seller. Such person is not a participant in the act of selling, which is the crime charged. *Harrington v. State*, 36 Ala. 236; *State v. Baden*, 37 Minn. 212, 34 N. W. 24; *People v. Smith*, 28 Hun 626; *Sears v. State*, 35 Tex. Cr. 442, 34 S. W. 124; *Trinkle v. State*, 60 Tex. Cr. 187, 131 S. W. 583; *State v. Wright*, 152 Mo. App. 510, 133 S. W. 664.

Section 2007 of Rem. & Bal. Code, abolishing the distinction between principals and accessories, and § 2260, Rem. & Bal. Code, defining as principals all participants, which are relied upon by the appellant, are not controlling on the situation here presented. These sections are general in their terms, and are manifestly intended to meet cases not otherwise specifically provided for by statute. They have no application to acts which are, by specific and distinct statutes, expressly designated and made subject to punishment as primary crimes in themselves. *People v. Bunkers*, 2 Cal. App. 197, 84 Pac. 364.

Any attempt to review all of the authorities cited by the appellant would extend this opinion without corresponding profit to an unwarranted length. A clear distinction between the case here and many of those cited lies in the fact that the crime charged was, in its very nature, such that the witnesses Gerald and Tupper could not have committed it,

and could not have been indicted for it.    They did not come within the class of persons included in the definition of the crime.    Not being subject to indictment for the crime charged, they were not accomplices within the meaning of the rule requiring corroboration of their testimony.    Those cases holding to the contrary seem to us as not logically sound.    We have examined the instructions given by the court, and we are of the opinion that they correctly stated the law as applied to the evidence.

The principal instruction requested by the appellant was taken from *State v. Pearson*, 37 Wash. 405, 79 Pac. 985. In that case, Pearson, Wilson and Lewis Haley were jointly charged with stealing cattle.    The witness John Haley had been convicted from another county for stealing these same cattle, the claim of the state being that the stealing was the joint act of John Haley and the parties charged.    It is thus evident that John Haley was an accomplice of the other three.    The court said:

"While we do not now announce the doctrine that a conviction should be permitted in no case on the uncorroborated testimony of an accomplice, nevertheless we do hold that the trial court should carefully caution the jury in such cases in the matter of weighing such testimony, and should warn it against a conviction on such uncorroborated testimony.    We think the refusal of the trial court to give the fifth instruction above set forth, which was requested by appellant, was reversible error."

In that case, we did not hold that in no case would a conviction be sustained on the uncorroborated testimony of an accomplice; much less, that a conviction could not be sustained on the uncorroborated testimony of one not in law an accomplice though closely connected with the crime.    The same is true of the case of *State v. Jones*, 53 Wash. 142, 101 Pac. 708.    In this connection, it may be again noted that the doctrine of invariable necessity of corroboration has been much further relaxed in the recent case of *State v. Stapp, supra*.    In any event, the cases cited are not ap-

plicable here.    The witnesses Gerald and Tupper were not accomplices.

We have considered the record with much care.    We find no error therein justifying a reversal.

The judgment is affirmed.

DUNBAR, C. J., MOUNT, FULLERTON, and MORRIS, JJ., concur.