[No. 26981. Department One. April 21, 1938.]

THE STATE OF WASHINGTON, *Respondent*, v.
MEL LONDON, *Appellant*.[1]

[1]Reported in 78 P. (2d) 548.

*Vanderveer & Bassett,* for appellant.

*B. Gray Warner, Henry Clay Agnew,* and *John M. Schermer,* for respondent.

SIMPSON, J.—Appellant was indicted by the grand jury of King county on ten counts for the crime of asking and receiving a bribe. Upon trial the verdict of the jury found appellant guilty on counts 1, 2, 3, 4, 6, and 7, and not guilty on counts 5, 8, 9, and 10. Judgment was entered upon the verdict fixing the maximum sentence at ten years on each count, the sentences to be served concurrently.

Count one of the indictment provided in part:

"He, said MEL LONDON, in the county of King, state of Washington; on or about the 7th day of February, 1936, then and there being, and being the duly appointed, qualified and acting assistant road supervisor of the third or north commissioner's district and road district of said King county, and being the de facto road supervisor for said district and being the person who then executed the functions of road supervisor for said district, there being then no road supervisor for said district other than he, the said MEL LONDON, did then and there wilfully, unlawfully and feloniously, directly and indirectly ask and receive from one Ben Nicholson money in the sum and of the value of forty-five dollars ($45) in lawful money of the United States, as compensation, gratuity, reward and bribe, upon an agreement and understanding that his, the said MEL LONDON's opinion, judgment, action, decision and official proceeding would be influenced thereby in this, that he, the said MEL LONDON would purchase for and cause to be purchased by, said King county certain concrete pipe required by said road district, for the maintenance and construction of county roads within said district, from the Nicholson Concrete Pipe Company, a partnership, and that he would approve and certify the bills covering such purchase, the duty of maintaining and constructing county roads within said district, and the duty of purchasing and ordering the

purchase of materials for such maintenance and construction, and the duty of certifying all bills for such material, being official duties of the said MEL LONDON as such assistant, acting and de facto road supervisor."

The contents of the remaining nine counts are essentially the same except as to the dates, amounts, and the names of the persons paying the alleged bribe. The following amounts appear in the remaining counts: $126, $50, $40, $50, $104, $12, $58, $46, and $60; and these amounts were alleged to have been paid to appellant either by Ben or Clem Nicholson.

Attention is directed to the following statutes which were in force at the time of the happening of the events hereinafter referred to, and which are germane to this case.

Rem. Rev. Stat., § 6398-2 [P. C. § 5964], provides the boards of county commissioners shall form their respective counties into suitable road districts. Rem. Rev. Stat., § 6398-3 [P. C. § 5965], provides the board of county commissioners may appoint road supervisors, who are required to give an official bond to the county, and after the approval of such bond by the board and the filing thereof with the county auditor, he shall be authorized to exercise the powers and duties of road supervisor. Rem. Rev. Stat., § 6398-4 [P. C. § 5966], provides the road supervisor, under the direction of the county commissioners, shall supervise the maintenance of roads and bridges within his district, and certify all bills for labor and material therein.

The essential facts may be summarized as follows: King county is divided into three road districts, namely, the south district, the city district, and the north district, otherwise designated as districts numbered one, two, and three respectively. We are here concerned with the activities of King county relating to roads in the north district, No. 3, during the period from Au-

gust, 1935, up to the winter of 1936. In this district, there were two shops operated by the county, namely, the Haller Lake shop and the Redmond shop. Supplies purchased by the county for roads were delivered at these shops. It appears there was in this district, during the above mentioned period, no road supervisor who had been duly appointed by the board of county commissioners of King county or qualified until the appointment of one A. J. Turnbull in September, 1936.

From September, 1935, until August, 1936, appellant was on the payroll of the north district as an employee of King county. It now becomes material to ascertain in what capacity he was engaged in this road district.

Appellant, whose true name is Melvin Ned Riggs, testified that his duties in the north road district were those of a public relations man between the road district, the county commissioners' office, and the general public. He testified further that he was listed as assistant road supervisor for this King county road district, with headquarters at Redmond and a local office in the county-city building in Seattle.

From September, 1935, until August, 1936, appellant's name appeared in the body of payrolls for the north district uniformly as "assistant supervisor," and these payrolls were approved by him. In approving these payrolls, appellant signed his name as "supervisor," "acting supervisor," and "assistant supervisor" on different months during the above mentioned period. The nature of appellant's duties in the road district and his official position will be more clearly presented as we proceed with the presentation of the facts of the case.

Incident to the maintenance of roads and the construction of roads involved in W. P. A. projects in this road district, it became necessary to purchase a considerable amount of pipe. While it is true that pipe

was purchased from several sources, a large proportion thereof was purchased from the Nicholson Concrete Pipe Company. This company appears to have been owned principally by one Archie Nicholson, and his two sons Ben and Clem were manager and bookkeeper thereof respectively. Ben severed his relations with the company May 14, 1936.

The procedure followed in effecting purchases of pipe was as follows: A certain white slip of paper, on which is designated in handwriting the pipe desired and the company from which the same was to be purchased, emanated either from the Redmond or Haller Lake shops from which the pipe was ordered. The name of appellant appears thereon, certifying that the items listed were a just and legal charge against King county. This white slip was in turn forwarded to the King county purchasing agent, who ordered from it.

Mr. Ben Nicholson, of the Nicholson Concrete Pipe Company, testified that, in the middle of August, 1935, he and appellant met together at the Redmond shops in Redmond. At that time, appellant asked Ben Nicholson if he was friendly toward the administration, and Mr. Nicholson replied that he was, and that he appreciated the business he secured from King county.

Appellant exhibited a list of pipe that he was desirous of obtaining and asked Mr. Nicholson if the Nicholson Concrete Pipe Company could donate to the county campaign. Mr. Nicholson stated that he thought the pipe company could do so. He also testified that, in the conversation relative to the donation for the campaign, appellant made the following statement to him:

"Well, he said if we would get together, we might do both ourselves some good."

Three days later, appellant and Ben Nicholson visited together again. At that time, Ben Nicholson pre-

sented a schedule of figures to appellant, and the amounts quoted were so much per foot for the different sizes of pipe.

A payment was to be made to appellant by the Nicholson Concrete Pipe Company of three cents per foot on 8″ pipe, four cents per foot on 12″ pipe, six cents per foot on 18″ pipe, and ten cents per foot on 24″ pipe.

The manner in which the amount to be paid appellant was computed is shown by state's Exhibit 2a:

"January 1936

| | | 4″ D. T. | 8″ | 12″ | 18″ | 24″ | 36″ |
|---|---|---|---|---|---|---|---|
| January | 3 | 50′ | 200′ | 75′ | | | |
| | 6 | | 80′ | 222′ | | | |
| | 7 | | | 72′ | 39′ | | |
| | 8 | | | 96′ | 39′ | | |
| | 9 | | | | 39′ | | |
| | 14 | | | 138′ | 60′ | | |
| | 15 | | | 39′ | 12′ | | |
| | 16 | | | 132′ | 36′ | | |
| | 17 | | | | 75′ | | |
| | 20 | | | 174′ | 36′ | 21′ | |
| | 21 | | | | | 57′ | |
| | 22 | | | | | 36′ | |
| | 23 | | | | 24′ | 36′ | |
| | 24 | | 30′ | 201′ | 21′ | | |
| | 27 | | 190′ | 66′ | | | 24′ |
| | 28 | | 200′ | 72′ | | | |
| | 29 | | 90′ | 138′ | 39′ | | |
| | | 50′ | 790′ | 1425′ | 420′ | 150′ | 24′ |
| | | .01¢ | .03¢ | .04¢ | .06¢ | .10¢ | .20¢ |
| | | .50 | 23.70 | 57.00 | 25.20 | 15.00 | 4.80 |

.50
23.70
57.00
25.20 Paid Cash
15.00 2/25/36
4.80

$126.20 Total"

Other exhibits, showing other payments to appellant and the method of arriving at the amount, are similar.

Most of these payments were made at the Redmond shops and some were made at the Washington Athletic Club by tendering envelopes containing currency.

Being asked about the three cents allowed on eight

inch pipe, Ben Nicholson said, "That was the kick-back."

Clem Nicholson, also of the Nicholson Concrete Pipe Company, testified that, when Ben Nicholson returned from his interview with appellant, he said:

"A. He said that Mr. London had made a proposition whereby he would pay—if we would pay so much per foot, on a basis of so much per foot for each size of pipe, that we could get some of that business out there."

He testified in regard to the payments made to appellant as follows:

"Q. What was your reason for paying these payments? A. To receive that business."

Following these interviews with appellant, a much larger volume of pipe was purchased from the Nicholson Concrete Pipe Company by King county.

Appellant urged as a defense, and submitted evidence to sustain it, to the effect that he was not acting as a road supervisor; that he did not receive a bribe, but that the money paid by the Nicholsons to him was voluntarily given as a contribution to John C. Stevenson in aid of his campaign for governor and his old age pension bill.

John C. Stevenson, chairman of the board of county commissioners of King county during 1935 and 1936, testified that he appointed appellant, and appellant was acting in the north district as the liaison officer between the county and W. P. A. projects, largely investigating road complaints, and reporting generally to the office in regard to road conditions and W. P. A. projects. He testified appellant did not at any time have authority over the entire north district; that he had no authority to hire and fire, and to make purchases for the county; and that he never was road supervisor or acting road supervisor. The witness also testified that he abolished

the office of road supervisor when one Wilson left. (Not disclosed when Wilson left.)

Appellant testified that he solicited funds from the Nicholsons to promote the old age pension and Mr. Stevenson's gubernatorial campaign, and that the Nicholsons made about seven contributions to him.

He testified as follows:

"Q. Did you at any time suggest any contribution by them to the campaign? A. This first meeting with Ben Nicholson? Q. Yes. A. I asked him if he would —he told me how he could help, other than by getting signatures to this petition, when they came out, and I stated at that time that the campaign was costing quite a bit at the time and would cost more in the future, and I asked him if he would give a contribution and he said he would. Q. Did he after that make a contribution to you? A. Yes, sir, he made several."

Appellant stated that he had no idea of the amount of money contained in the envelopes, hereinafter referred to, tendered to him by the Nicholsons, or that the amounts placed therein were determined on the basis of so much per foot of pipe.

The following letter was sent by Mr. John P. Angel, King county purchasing and property agent, to the Haller Lake shops:

"Upon request of Mr. Stevenson, please be advised that hereafter all purchases amounting to over fifty dollars should be made through this office."

Mr. Stevenson testified that the reason this letter was sent was to obtain a triple check on purchases, that is, the purchasing agent would check the price of the commodity; the county commissioners would certify the bill; and the county auditor would make a third check to ascertain if the merchandise was received and if the price was satisfactory at which they were purchased.

At the close of the state's case, appellant challenged

the sufficiency of the evidence introduced by the state and moved the court to instruct the jury to return a verdict of not guilty in favor of appellant.

The trial court entered judgment upon the verdict; and a motion for a new trial having been denied, this appeal was taken.

The material assignments of error relate to the refusal of the trial court to sustain the challenge of appellant to the sufficiency of the evidence and the failure to grant the motion for a directed verdict, the refusal to give appellant's instruction No. 6, and the denying of appellant's motion for a new trial.

With respect to the official status and the scope of the administrative powers and functions of appellant in the north road district of King county, the testimony is somewhat conflicting. After an examination of the record, however, we are satisfied that appellant was a *de facto* road supervisor in that district during the period when several of the payments of money referred to in the indictment were tendered by the Nicholsons to appellant. As such, he was vested with a wide latitude of supervisory powers over that district. He approved payrolls, supervised county personnel therein by directing the employment of certain men, and certified bills for materials furnished by the county incident to the construction and maintenance of roads within the district.

The mere fact that appellant was not formally appointed by the board of county commissioners, that he had not tendered the appropriate bond to the board for its approval, and that he had not filed the same, did not preclude appellant from qualifying as *de facto* road supervisor from September 1, 1935, to August 12, 1936, in the north road district. 21 Cal. Jur. 1012, § 171.

"An officer *de facto* is one who by some color of right is in possession of an office and for the time being per-

forms its duties with public acquiescence, though having no right in fact. His color of right may come from an election or appointment made by some officer or body having colorable but no actual right to make it; or made in such disregard of legal requirements as to be ineffectual in law; or made to fill the place of an officer illegally removed; or made in favor of a party not having the legal qualifications; or it may come from public acquiescence in the officer holding without performing the precedent conditions, or holding over under claim of right after his legal right has been terminated; or possibly from public acquiescence alone when accompanied by such circumstances of official reputation as are calculated to induce people, without inquiry, to submit to or invoke official action on the supposition that the person claiming the office is what he assumes to be. . . .

"No one is under obligation to recognize or respect the acts of an intruder, and for all legal purposes they are absolutely void. But for the sake of order and regularity, and to prevent confusion in the conduct of public business and in security of private rights, the acts of officers *de facto* are not suffered to be questioned because of the want of legal authority except by some direct proceeding instituted for the purpose by the State or by some one claiming the office *de jure,* or except when the person himself attempts to build up some right, or claim some privilege or emolument, by reason of being the officer which he claims to be. In all other cases the acts of an officer *de facto* are as valid and effectual, while he is suffered to retain the office, as though he were an officer by right, and the same legal consequences will flow from them for the protection of the public and of third parties. This is an important principle, which finds concise expression in the legal maxim that the acts of officers *de facto* cannot be questioned collaterally." 2 Cooley's Constitutional Limitations (8th ed.), 1355-58.

"The general rule is that the acts of a *de facto* officer are to be upheld as valid so far as they involve the interests of the public and of third persons, or until his title to the office is adjudged insufficient. Accordingly if an official person or body has apparent authority to

appoint to public office, and apparently exercises such authority, and the person so appointed enters on and performs the duties of such office, his acts will be held valid in respect to the public, whom he represents, and to third persons, with whom he deals officially, notwithstanding there was a want of power to appoint him in the person or body which professed to do so. The practical effect of the rule is that there is no difference between the acts of *de facto* and *de jure* officers so far as the public and third persons are concerned. The principle is placed on the high ground of public policy, and for the protection of those having official business to transact, and to prevent a failure of public justice. Third persons, from the nature of the case, cannot always investigate the right of one assuming to hold an important office. They have a right to assume that officials apparently qualified and in office are legally such, even though a contest is pending. Furthermore the *de facto* officer is estopped from taking advantage of his own want of title, or from denying his responsibility for official acts." 22 R. C. L. 601, § 324.

One cannot escape criminal responsibility merely because his official status is that of a *de facto* officer.

"Criminal responsibility of officers for violation of official duties extends to *de facto,* as well as *de jure,* officers." 46 C. J. 1062, § 379.

"It is immaterial that the public officer sought to be bribed was not a legally qualified officer, or that he did not have title to his office, as in the case of a city commissioner who is merely a *de facto* officer; or of a road engineer who is not a qualified official under the state constitution. The rule is that an officer *de facto* is punishable for accepting or soliciting a bribe in the same manner as if he were an officer *de jure.* And likewise it is a crime to offer or to give him a bribe." 4 R. C. L. 185, § 14.

"The courts will take notice that the person who was bribed was a public officer, and they will take notice of the date of his appointment or accession, of the public acts performed by him as such officer, and the date

when his term expired. It suffices if the officer is an officer *de facto*. The regularity and validity of his tenure are irrelevant. The defendant will not be permitted to show that the officer was not appointed in writing, or sworn, or that he was otherwise unqualified under a statute." Underhill's Criminal Evidence (4th ed.), 1331, § 716.

See, also, Constantineau on the De Facto Doctrine (1910), 358, § 260.

 Bribery has been defined as follows:

"The crime may be defined as an attempt, whether successful or the reverse, to influence an officer in the discharge of his official duties, either in the executive, legislative or judicial department of the government by the offer of a reward or pecuniary consideration." Underhill's Criminal Evidence (4th ed.), 1329, § 715.

"Bribery is corruptly tendering or receiving a price for official action." 3 Wharton's Criminal Law (12th ed.), 2522, § 2234.

See, also, 9 C. J. 402, § 1.

Rem. Rev. Stat., § 2321, defines bribery, prohibits the practice, and provides certain penalties for such official misconduct.

It is conceded that it is essential to a conviction for bribery that the person charged to have been bribed shall be an officer, *de facto* or *de jure*, or among the governmental administrative personnel, and has been influenced in the discharge of the official administrative duties assigned to him by asking for and receiving something of value in connection therewith.

Appellant relies on *State v. Hart*, 136 Wash. 278, 239 Pac. 834, to the effect that the offense of bribery is impossible unless the particular act for which it is alleged the officer was paid comes within the lawful authority and power of that officer.

The present case, however, reflects a different factual situation, in that the record discloses evidence to

the effect that appellant asked for and received compensation or a gratuity in exchange for allocating business to the Nicholson Concrete Pipe Company, which he was permitted to do while engaged in the discharge of his official administrative duties, and thus was influenced in an unlawful manner.

The testimony relating to negotiations of appellant with the Nicholson Concrete Pipe Company for the purchase of pipe, and the facts surrounding the solicitation of funds from that company for political campaign purposes, is conflicting.

The jury were warranted in believing that appellant was a *de facto* officer, that he accepted money from the Nicholsons, and that they secured an extra amount of county business because of such payment.

The evidence introduced to prove that the amount of money paid was determined by the amount and size of the pipe delivered to the county was adverse to appellant's claim that the money was a voluntary contribution to a campaign fund, as was the fact that the money was paid in cash many times at night.

The question was not what was done with the money after appellant secured it, but the reason and purpose of receiving it.

There is evidence in the record, if believed, to the effect that appellant was placed in such a position that he was able virtually to determine from whom King county would purchase its supplies and materials for the north road district, notwithstanding the fifty dollar limitation and the fact that the county purchasing agent, the board of county commissioners, and the county auditor, had to approve the purchases contemplated and desired by appellant.

"Whether under the evidence the crime has been committed is a question of fact for the jury. It is for the court to instruct the jury as to the legal tendency of the evidence and for the jury to determine its weight

in proving or disproving the issue on trial." 9 C. J. 415, § 27.

There was evidence which was proper to submit to the jury, inasmuch as it tended to establish the essential elements of the crime charged. The weight and credibility of the evidence was for the jury, as we pointed out in *State v. Wappenstein,* 67 Wash. 502, 121 Pac. 989, in which we said:

" 'It is difficult to formulate a general rule stating the extent to which appellate courts will pass upon the weight and sufficiency of evidence and reverse because of an insufficiency of evidence, but the general rule seems to be that where there is material evidence tending to prove defendant's guilt before the jury, and the trial court refuses to set their verdict aside, an appellate court will not reverse the action of both the trial court and the jury; that it will examine the record to see whether there is evidence proper to go to the jury, and upon which a verdict of guilt might reasonably be founded, and, being satisfied on that point, will refuse to interfere, whatever may be its own opinion of the weight or preponderance of the evidence. If, however, the verdict of the jury is altogether unsupported by any evidence whatever, or if it is against the evidence and every proper inference which is reasonably deducible therefrom, the judgment will be reversed by the appellate court.' "

We find the trial court did not err in refusing to give instruction No. 6, inasmuch as a *de facto* road supervisor is not required to comply with the statutory conditions precedent demanded of a *de jure* road supervisor before he may qualify for office, and we do not find that the trial court abused his discretion in refusing to grant a new trial.

The judgment is affirmed.

STEINERT, C. J., MAIN, GERAGHTY, and ROBINSON, JJ., concur.