[No. 37255. Department One. April 1, 1965.]

THE STATE OF WASHINGTON, *Respondent*, v. NORMAN WADIE AUSTIN, *Appellant*.*

*Reported in 400 P. (2d) 603.

*Chavelle, Chavelle & Greenway*, for appellant.

*Charles O. Carroll, Mary W. Brucker*, and *Robert E. Dixon*, for respondent.

HALE, J. — Bribery, like murder, will out, particularly when the negotiations are broadcast by police radio transmitters.

The prosecuting attorney for King County charged Norman Wadie Austin and Patsy Gentile jointly as principals with bribing a Seattle police detective to influence his actions in a grand larceny prosecution. Gentile later pleaded guilty to the bribery charge and received a sentence of 10 years imprisonment; Austin went to trial and from a judgment and sentence of 10 years imprisonment appeals, making 13 assignments of error from which three questions of law emerge. First, the essential facts:

Detective Neal H. Sorenson, as a member of the Seattle police department's auto theft detail, working with five other officers, had been investigating a commercial auto theft ring since May, 1962. After an investigation of more than 6 months, he uncovered a transaction that led them to believe that Austin had been involved in the sale of a stolen Corvette automobile. The officers took their investigative reports and evidence to the prosecuting attorney who filed a complaint, in a justice of the peace court, charging Austin with grand larceny. Detective Sorenson served the warrant of arrest by delivering Austin to the city jail. A few hours later, the defendant was transferred to the county jail into the custody of the King County sheriff. When Sorenson testified for the state at Austin's preliminary hearing before the justice of the peace, he had virtually completed his assigned official duties and investigation in the case except to remain available as a witness at the trial in superior court. Finding probable cause for prosecution, the justice of the peace, on March 5, 1963, bound defendant Austin over to the superior court on the grand larceny charge, fixing bail at $1,000.

Detective Sorenson says that, about 8:30 in the morning, January 7, 1963, while the complaint was pending in the

justice of the peace court against Austin, Gentile called him on the telephone at the police station and arranged a meeting with him at the Northern Lights Cafe. Sorenson went there about an hour later, and Gentile told him that Austin would pay the officer $1,500 to, as he expressed it, "get the case kicked out of court." At first Sorenson remained noncommittal, but Gentile persisted, raising the offer to $2,000. When Sorenson left the cafe shortly thereafter, he did so with the understanding that Gentile would call him on the telephone and the detective would indicate whether the case could be "kicked out of court," by giving a simple yes or no answer. Gentile made the telephone call. According to Sorenson, the officer answered "Yes," and they arranged to meet again at the Canton Gardens Restaurant, at 7:40 p.m., January 9th.

In the meanwhile, Officer Sorenson had reported the offer to his superiors, and they arranged to have him wear a lapel microphone connected to a portable radio transmitter at his next interview with Gentile. By this device, he could broadcast their conversation to other officers in a nearby automobile which was equipped with a radio receiver of the same frequency as the transmitter and coupled to a tape recorder.

Before Sorenson's final scheduled rendezvous with Gentile at the Canton Gardens, Austin called him to request a separate meeting, and it was agreed that the two would meet at the Cottage Cafe. Sorenson went there equipped with a tiny radio transmitter and, after a few preliminary remarks, the two men got into Sorenson's automobile from which their conversation was broadcast to and recorded by police officers in an automobile close by. During this conversation, Austin acknowledged that Gentile was representing him, but said that he didn't trust Gentile because of the latter's character and past associations. He told Sorenson that he knew of Sorenson's impending meeting with Gentile at the Canton Gardens, but asserted that he would rather bypass Gentile and deal directly with Sorenson, saying that he had the money with him and offering to hand it over at that moment.

When Sorenson pointed out that Gentile might cause trouble by talking about the whole situation, Austin agreed that they go through with the original plans as arranged by Gentile. The conversation closed with Austin telling Sorenson that he would drive Gentile to the rendezvous at the Canton Gardens for his final meeting with Sorenson.

Sorenson kept his appointment with Gentile at the Canton Gardens at precisely 7:40 p.m., carrying again the tiny microphone and radio transmitter on his person. In his testimony, the officer described the meeting thusly:

"A. Yes, sir. When I walked into the Canton Gardens —it is on two floors; the restaurant is on the main floor and the cocktail lounge was downstairs. I walked downstairs and Mr. Gentile was sitting at a small table in the cocktail lounge. Q. And what occurred when you got to the cocktail lounge? A. I sat down with Mr. Gentile and he bought me a drink. We started talking. He asked me if all arrangements had been made, if this case was going to be kicked out of court. I told him that arrangements had been made. Q. Then what occurred? A. We talked a few minutes more of nothing in particular, just a few things in general, and then Mr. Gentile reached into his pocket and brought out a large roll of money with a rubber band around the roll, and there was a money wrapper around the twenty-dollar bills. Q. And did you put that in your pocket? A. No, I couldn't get it in my pocket. It was too big. Q. What did you do with it? A. He said— this was prior to passing the money—he said, 'Is it all right if I take one hundred dollars from this two thousand dollars for my trouble involved in this?' I said, 'Yes, that is all right. Go ahead.' Which he did; he took two fifty-dollar bills from the roll. Q. And what were you able to do with the nineteen hundred dollars? A. Nineteen hundred dollars I kept in my hand underneath the table. And at the time he passed the money to me, I stated so that the officers listening in on the recorder on the other end would know that the money had been passed, 'Is this all of the money?' And Mr. Gentile said, 'Yes, that's it.' Q. And you were wired at this time? A. Yes, sir. I had a portable transmitter in my pocket."

Austin had left his car outside the Canton Gardens. Officer Blackwood says that he saw Austin in the doorway of the Gay Nineties about four doors and approximately 100 feet

from the entrance of the Canton Gardens. Ten minutes after Gentile had been placed under arrest and taken to the police station, Austin returned to his automobile where he too was arrested. At the police station during interrogation, Officer Sorenson said that Austin told him he had talked with Gentile several times about getting the larceny case kicked out of court and again used this expression when he said he would pay any amount of money to get it done.

Appellant objected to the testimony of Detective Sorenson in retelling the conversations between the detective and Gentile which took place in Austin's absence, claiming this evidence to be hearsay and depriving appellant of the right of cross-examining Gentile. He points to the rule that the conversations or admissions of one conspirator or co-defendant are not admissible against one not present at the time they were made, and cites *State v. Goodwin*, 29 Wn. (2d) 276, 186 P. (2d) 935. We do not see *State v. Goodwin*, *supra*, in the same light as does appellant, for we read it to hold that the written confessions of a co-defendant tried jointly with others may be admitted in evidence against the confessor but that the other defendants are entitled to an instruction that such confession or other statements made out of their presence and hearing cannot be considered as evidence against them. *State v. Goodwin*, *supra*, thus does not meet the facts here.

The precise question here is whether the declarations, statements and admissions of one defendant, made in the absence of but while acting for or with another in the commission of a crime, may be admissible against the absent defendant—a query which raises the collateral question of criminal agency. Generally the admissions or statements of an agent made during his principal's absence may be admitted against his principal only after the fact of agency has been proved by prima facie evidence aliunde the statements or admissions. Expressed another way, the agency must be shown prima facie before the agent's declarations and statements may be admitted against his principal, and they must additionally be within the scope of

the very agency apparently established. *Griffiths v. Big Bear Stores, Inc.*, 55 Wn. (2d) 243, 347 P. (2d) 532; *State ex rel. Hamilton v. Standard Oil Co. of California*, 190 Wash. 496, 68 P. (2d) 1031. Only after prima facie proof of the agency will the admissions and statements of the agent be received against his principal. *State v. Stanley*, 170 Wash. 429, 16 P. (2d) 817. Therefore, the fact of agency cannot be proved by the admissions of the agent; that crucial fact must be shown by other evidence before the agent's admissions and declarations made in his principal's absence may be introduced in evidence against the principal. *State v. Stanley, supra;* 2 Wharton's Criminal Evidence (12th ed.) § 414.

When Detective Sorenson testified that he talked with Austin at the Cottage Cafe prior to the meeting with Gentile, and Austin then acknowledged to him that Gentile was negotiating for him and Austin offered to pay the bribe money then and there, at the same time expressing doubts concerning Gentile's ethics as a fiduciary, he supplied prima facie evidence of an agency between Gentile and Austin. Other prima facie evidence of agency is found in Austin's statement to Sorenson that he intended to drive Gentile to the Canton Gardens for his final rendezvous with Sorenson. Corroborating the proof of agency was evidence of Austin's presence near the Canton Gardens during the conversations, the exchange of money between Gentile and Sorenson, and Austin's later statement that he would like to get the case kicked out of court.

In *State v. Bates*, 52 Wn. (2d) 207, 324 P. (2d) 810, we held that proof of a conversation with one defendant in the absence of another shall be admissible where the facts other than the conversations showed a concert of action between them and that both were parties to the criminal acts. To the same effect are *State v. Kelsey*, 46 Wn. (2d) 617, 283 P. (2d) 982; *State v. Garrison*, 34 Wn. (2d) 654, 209 P. (2d) 454. Recently, in *State v. Nelson, ante* p. 189, 396 P. (2d) 540, we considered the confessions of one defendant admitted against a co-defendant where the two were charged jointly but tried separately, and we held that, since

the confessing defendant was not on trial, his written confession became heresay evidence and, therefore, inadmissible against the defendant on trial.

In the instant case, however, the declarations and statements admitted in evidence were made during the commission of the offense and as a part of the res gestae and received in evidence only after proof prima facie that the declarant was the agent of the defendant and acting in concert with him. We see, therefore, no error in admitting the statements and admissions in evidence.

Appellant assigned error to denial of his motion to dismiss at close of plaintiff's case and his challenge to the sufficiency of the evidence. Urging that no bribery was proved within the meaning of our statute, appellant contends that the police officer had completed his investigation, had no further connection with the case save as a witness, and had no power, official or otherwise, to get the case "kicked out of court." Indeed, the officer testified that not only was he without power to dismiss the case, but added that it would constitute a serious violation of police regulations for him to interfere with or take any steps to impair the prosecution of a case once filed. Detective Sorenson said that, after he had submitted the case to the prosecuting attorney, had filed the complaint, and had made the arrest, his sole remaining assigned duty was that of witness. Appellant argues, accordingly, that, at the time the purported bribe offer was made, the police officer, having no further direction or control over the grand larceny prosecution, could not, under the bribery statute, be influenced with respect to "any act, decision . . . or other proceeding . . . in the exercise of his powers or functions," and, therefore, says appellant, a necessary element of the crime of bribery is wanting.

Pertinent portions of the statute under which the prosecuting attorney brought the information read, in part:

"Every person who shall give, offer or promise, directly or indirectly, any compensation, gratuity or reward to . . . a person executing any of the functions of a public officer . . . with intent to influence him with respect

to any act, decision, vote or other proceeding in the exercise of his powers or functions, shall be punished by imprisonment in the state penitentiary for not more than ten years, or by a fine of not more than five thousand dollars, or by both." RCW 9.18.010.

The information charged that Austin and Gentile

" . . . did offer and give compensation to a public officer of the State of Washington, to-wit: Detective Neal H. Sorenson, Seattle Police Department, with intent that said offer and gift of compensation would influence the said officer with respect to acts and decisions to be made by him in his official capacity;"

Since *State v. Nick*, 66 Wash. 134, 119 Pac. 15 (1911), we have not doubted that a regularly appointed, constituted and sworn police officer is a public officer within the meaning of the bribery statute, RCW 9.18.010. Later, we confirmed this by holding that a policeman is a public officer in a prosecution for grafting, a gross misdemeanor now codified under RCW 9.18.110, where the defendant solicited and received a sum of money on a representation that he, as a former policeman, had influence with the police department and could get a drunk-driving charge quashed. *State v. Worsham*, 154 Wash. 575, 283 Pac. 167. And, in *State v. Cooney*, 23 Wn. (2d) 539, 161 P. (2d) 442, where a Pasco police officer accepted a bribe to unlawfully release a person held in custody at the Pasco city jail, we held members of an organized police force to be public officers within the meaning of the bribery statute, saying:

" . . . Whether or not he did something which, as a police officer, technically he had no right to do is immaterial so long as the act was not entirely beyond his official duties as such officer."

■ Appellant cites *State v. Hart*, 136 Wash. 278, 239 Pac. 834, in which the information charged the Governor of this state with asking a bribe by requesting that bank liquidators be allowed an abnormally high and unreasonable fee so that a portion thereof be turned over to the defendant. We held then, and affirm the doctrine now, that, where the public officer has no official concern or duty with

respect to the matter whereof he is influenced, a vital element of the crime of bribery is wanting. We accordingly ruled the information in *Hart* bad, because the Governor had no connection whatever with fixing of fees for bank liquidators or their attorneys, this being the exclusive function of the supervisor of banking subject to court approval by the judge before whom the bank insolvency proceedings were pending. The ultimate effect of our ruling in *Hart* was that there can be no offense of bribery under the existing statute unless the particular act for which it is alleged that the officer was paid comes within the lawful authority and power of that officer. We affirmed *Hart* by implication, but distinguished it on the facts, in *State v. London,* 194 Wash. 458, 78 P. (2d) 548, 115 A.L.R. 1255. The same reasoning sustains our decision in *State v. Whetstone,* 30 Wn. (2d) 301, 191 P. (2d) 818, but the situation is markedly different here.

■ Police officers have many official duties, among which is the investigating of crime and presenting of evidence in its prosecution. That the investigation has been completed and the avails thereof turned over to the prosecuting attorney for prosecution, does not, we think, sever the investigating officer's official connection with the case. Nor does the fact that the prosecuting attorney assumes the primary responsibility for and control of the prosecution once a criminal charge has been filed, end the investigating officer's official connection with the case. The policeman's function as a public officer, duty bound in law and oath to uphold and enforce the law, persists throughout all stages of a criminal proceeding until final adjudication thereof in the courts. The payment of money to a police officer for the purpose of inducing a breach of duty in connection with a criminal charge of which a police officer possesses information and may give competent evidence, or to dissuade him from seeking or obtaining evidence in the performance of his official duties, constitutes bribery under RCW 9.18.010.

We have examined all other errors assigned, find them to be without merit, and order the judgment affirmed.

ROSELLINI, C. J., HILL, OTT, and HUNTER, JJ., concur.