[No. 29137. Department One. December 17, 1943.]

THE STATE OF WASHINGTON, *Respondent*, v. LORENZO D. EMERSON, *Appellant*.[1]

[1]Reported in 144 P. (2d) 262.

*Fred M. Bond,* for appellant.

*John T. Welsh* and *Robert A. Hannan,* for respondent.

JEFFERS, J.—Defendant, Lorenzo D. Emerson, was, by an information filed by the prosecuting attorney for Pacific county, on February 11, 1943, charged with the crime of assault in the second degree. The information was based upon Rem. Rev. Stat., § 2414 [P. C. § 8759], subdivisions 3 and 4, and, in so far as material, charged the defendant as follows:

"That Lorenzo D. Emerson, the defendant in the above entitled action, on or about the 9th day of January, 1943, in the county of Pacific, state of Washington, then and there being, did then and there willfully and unlawfully strike, wound and inflict grievous bodily harm upon Emil W. Laakko, a human being, with a weapon, to-wit: a knife or other sharp instrument then and there held by said defendant, the exact nature of which weapon, knife or other sharp instrument is not now known to the prosecuting attorney; and that the weapon, knife or other sharp instrument which was then and there held by said defendant and with which he struck and inflicted grievous bodily harm upon the person of said Emil W. Laakko as aforesaid, was an instrument capable of producing bodily harm upon a human being."

Rem. Rev. Stat., § 2414, in so far as material, provides:

"Every person who, under circumstances not amounting to assault in the first degree —

"(3) Shall willfully inflict grievous bodily harm upon another with or without a weapon; or

"(4) Shall willfully assault another with a weapon or other instrument or thing likely to produce bodily harm;

. . .

"Shall be guilty of assault in the second degree. . . ."

In answer to this information, the defendant, on March 2, 1943, appeared both in person and by counsel, and entered a plea of not guilty.

The cause came on for hearing before the court and jury on May 4, 1943, and thereafter, on May 5th, the jury returned a verdict of guilty of assault in the second degree, as charged in the information. Defendant filed motions in arrest of judgment and for new trial, which motions were denied on May 26, 1943, and, on the same day, judgment and sentence was entered on the verdict. Defendant in open court gave oral notice of appeal from the judgment entered.

Appellant assigns error, first, in refusing to discharge appellant at the close of the evidence; second, in submitting the cause to the jury upon assault in the second degree; third, because of prejudice to the jury by the prosecuting attorney's asking the witness Dorrance Loomis, on cross-examination, whether she was under United States quarantine; fourth, in permitting the state to introduce (over appellant's objection) evidence of state patrolman Arthur Baker that Ida Barber, a witness for appellant, had stated to him that "defendant had a knife, that he hid it or got away with it, that she would search for it and see if she could find it," and that she did search for it while he was there; fifth, in not submitting to the jury the question of assault in the third degree; sixth, in giving instruction No. 6, explaining assault in the first and second degrees only, and not assault in the third degree; seventh, in giving instruction No. 7, in that it did not explain to the jury assault in the third degree; eighth, in denying the motion in arrest of judgment; and ninth, in denying the motion for new trial.

We shall discuss together assignments of error Nos. 1, 3, and 8, as appellant has done, as these assignments all present the question of whether or not there was sufficient evidence to justify the submission to the jury of the question of appellant's guilt or innocence of the crime of second-degree assault.

■ Appellant contends the evidence is not sufficient to justify a verdict of second-degree assault. It is not enough, to sustain this contention, that the evidence was conflicting, for, as we stated in *State v. Budreau,* 156 Wash. 103, 114, 286 Pac. 51:

"The evidence in this case is extremely conflicting. That of appellants tended to prove that they were innocent of the offense with which they stood charged. Had the jury believed appellants' evidence, verdicts in appellants' favor would undoubtedly have been returned. It is not for this court to determine disputed questions of fact, and we are constrained to hold that the verdicts of guilty as returned are supported by competent testimony."

In *State v. Baxter,* 16 Wn. (2d) 246, 132 P. (2d) 1022, we quoted with approval the following rule announced in *State v. Wappenstein,* 67 Wash. 502, 121 Pac. 989:

" ' "It is difficult to formulate a general rule stating the extent to which appellate courts will pass upon the weight and sufficiency of evidence and reverse because of an insufficiency of evidence, but the general rule seems to be that where there is material evidence tending to prove defendant's guilt before the jury, and the trial court refuses to set their verdict aside, an appellate court will not reverse the action of both the trial court and the jury; that it will examine the record to see whether there is evidence proper to go to the jury, and upon which a verdict of guilt might reasonably be founded, and, being satisfied on that point, will refuse to interfere, whatever may be its own opinion of the weight or preponderance of the evidence. If, however, the verdict of the jury is altogether unsupported by any evidence whatever, or if it is against the evidence and every proper inference which is reasonably deducible therefrom, the judgment will be reversed by the appellate court." ' "

■ In the present case, Emil Laakko, the man claimed to have been assaulted by appellant, testified in substance as follows: That he was a member of the United States coast guard, stationed at South Bend, Washington; that, while he had seen appellant Emerson around South Bend, he first met him in the Olson club, in South Bend, about seven o'clock on the evening of January 9, 1943. The wit-

ness further testified that, when he went into the Olson club on the date mentioned, appellant and a Mrs. Barber were sitting in a booth, and that he joined them, sitting on the opposite side of the table; that, while he was sitting there, Mrs. Barber got up, and appellant jumped up and knocked her down; that the witness then got up and pinned appellant's arms behind his back, to give Mrs. Barber a chance to get up; that at this time John Autio, the bartender, came around from behind the bar and told the witness to leave appellant alone, that he would take care of him, and he did; that, when the witness pinned appellant's arms behind him, Mrs. Barber was on the floor, and it looked like appellant was going to strike her again; that, as appellant went out, he said to Laakko: "I will get you for that."

It further appears from Mr. Laakko's testimony that shortly after the above occurrence he left the Olson club for about a half hour, and then came back, standing at about the middle of the bar; that he did not see appellant when he (Laakko) first entered the club the second time, but later saw him standing at the far end of the bar. It further appears from the testimony that, as Mr. Laakko was standing at the bar drinking beer, appellant came up behind him. To use his own words:

"I stood there drinking beer and listening to some conversation going on, and the first thing I knew he was right up against me, against my back; I was facing the bar."

The testimony continues:

"Q. Show the jury what the defendant did, about coming up? A. His front went right up against me, against my back so I felt him pretty heavy, I felt his arm here (indicating) and when he came down this way (indicating) I imagine he came down, and shortly after that just like a thorn. Q. Did you feel anything at the time? A. Just like a sharp thorn. Q. In your side? A. Yes. Q. Then what happened to you — what did John Autio do, if anything? A. He came around the bar and he took this fellow [appellant] out; and when he came back I had blood on my hand; I felt the blood trickle down; and there was a hole in my

jumper. Q. What were you wearing that evening? A. I had a jumper. Q. Was the jumper cut? A. Yes. Q. What other clothing did you have inside? A. Just an undershirt. Q. Were they both cut? A. They were. Q. What did you say then and there at that time? A. I just said I was stabbed. Q. Were you bleeding much? A. Bleeding quite a bit. Q. What did Autio do? A. He took me in the back room and put on one of those adhesive plasters. Q. Were you still bleeding. A. Yes."

It further appears from the testimony of this witness that he continued to bleed and that he went to his boat and changed the bandage; that thereafter he went to Raymond, where sometime that evening he was treated by Dr. Nevitt; that, after he had been treated by Dr. Nevitt, apparently the witness continued to move around and the bleeding continued. He was later taken to the Raymond hospital, but, as the coast guard had a contract with the South Bend hospital, he was taken to the latter place, where, according to his testimony, he arrived about twelve-thirty. Here he stayed until the following Tuesday morning, and was treated by Dr. Anderson, whom he continued to see for about three weeks. The witness testified he did not see anything in Emerson's hand.

John Autio, bartender at the Olson club the evening of January 9th, testified that he knew appellant. The witness was interrogated in part as follows:

"Q. Will you tell what happened if anything in the Olson club on January 9th, 1943, in South Bend Washington between the defendant and Big Ida [Mrs. Barber], if anything? A. Well the first I noticed, this Big Ida got up out of the booth and the defendant came up and slapped her on the jaw and knocked her down; anyhow she went down. I went over to pick her up, and this Laakko— Q. When she went down on the floor, in what attitude was the defendant—what was he doing or appearing to do at that time? A. He hit her and she fell down, and this Laakko grabbed Emerson and he held his arms behind his back. Q. You have not answered the question yet, you said that he hit her? A. Yes. Q. That is Emerson hit the woman? A. Yes. Q. She went down? A. She went down. Q. On the floor? A. Yes. Q. Then did Emerson walk away or stand there,

and if he stood there what was he doing? . . . A. Well as soon as he knocked her down he stood off to one side and Emil [Laakko] walked over there and grabbed him. What his attitude was I don't know, he just looked down on her and at that time Emil grabbed him. . . .

"Q. You picked Ida up? A. Yes sir and she went into the rest room to fix herself up. I told Emil to let loose of Emerson and I would take care of him and Emil let him loose and Emerson going out said: 'I will get you for this.' Q. Emerson said that to Laakko? A. Yes. Q. Then what did Emerson and Big Ida do after that? A. Emerson went out and Ida went back and sat down and in about fifteen minutes or a half hour, I don't know just how long Emerson came back in the Olson club. Q. Then what happened? A. He went clear in the back end of the building, the far end of the bar and sat down. Q. Emerson and the woman? A. Emerson and the woman; and then they sat clear back there, they were not drinking, they sat and talked a while and pretty soon Emerson came back; walked up behind Laakko and threw his left arm over— Q. Show the jury what he did. A. He threw his left arm over his left shoulder and stuck his hand under his [Laakko's] right arm. I did not know what he was going to do; I figured he was going to pull him off of the stool; and fight, so I walked around and put him outside. Q. Where was Laakko facing at that time? A. He was facing the back bar. Q. That would be facing the bar? A. He would be facing the bar. Q. Emerson would be at his back or front? A. He would be at his back. Q. Immediately after you took hold of Emerson what did you do? A. I put him outside; I asked him to go outside. Q. He went out? A. He did. Q. Then what did you find with reference to this Laakko? A. Then I came back in after I put Emerson out and I walked clear behind the counter; and about that time Emil [Laakko] reached in his blouse— Q. Who was reaching? A. Emil was; and he came out with his hand all covered with red, with blood; so I took him out in the back room and put a dressing on. Q. Did you examine the wound? A. I did not examine it very close; I looked at it, seen it was bleeding pretty bad and I put a piece of tape on it. Q. Which side was it bleeding from? A. The right side."

This witness further testified that Emerson did not say anything to Laakko as he came up behind the latter. Mr. Autio did not see anything in Emerson's hand.

Mrs. Eric Lund, called by the state, testified in part as follows:

"Q. Now Mrs. Lund were you in Olson's tavern on Water street South Bend, Washington, on January 9th, 1943? A. Yes sir. Q. Did you see Mr. Laakko there at that time? A. Yes. Q. In particular I ask you this; were you close to this man Laakko? A. Yes sir I was on the first stool from him. Q. Where were you sitting, you and him? A. I was sitting facing the bar. Q. Right beside you? A. Yes sir. . . . Q. Will you tell us what you saw, what happened at that time and place? A. Mr. Emerson came walking from the left, I thought . . . Q. Stand down here and show the jury—assume this is part of the bar, show the jury what happened. A. He came and put his hand around like that (indicating). Q. Show how he did it? A. He just grabbed hold of him. Q. In the back or front? A. The back. Q. Then what happened? A. I don't know. Q. You tell what you saw? A. He just came and grabbed hold of Laakko, and John Autio came and pulled him away and put him outside. . . . Q. Did he say anything to Laakko at that time? A. No. Q. Had Laakko said anything to him? A. No. . . . Q. Did you wait a while there then? A. Yes. Q. Then what happened, what did Laakko do? A. Laakko he went in the back and dressed his sore. Q. Did you see any blood there? A. Yes. Q. What did Laakko do after Emerson did that, tell us what he did. A. He did not do anything, he just pulled up his shirt and I saw blood. Q. Was he bleeding? A. Yes. Q. You saw the blood? A. Yes. Q. Then what did Autio do? A. Autio he went and dressed it. . . . Q. This man (indicating) was bleeding was he? A. Yes. Q. From the right side? A. Yes."

This witness testified she did not see anything in Emerson's hand.

Dr. Nevitt testified that he met Laakko the night of January 9th in his office; that he examined Laakko and found a small cut between the ribs on the right side; that at the time Laakko was not bleeding a great deal, but he had been, as there was blood all inside his jersey. The doctor testified that the cut was about one-half inch long, and narrow. He did not determine how deep it was. He further testified it looked like a cut such as would be made by a sharp instrument. The doctor testified that the

wound must have cut into a blood vessel, as it bled so freely. The doctor also stated that a cut such as this would probably not produce much pain at first.

Dr. Anderson testified that he first saw Mr. Laakko the night of January 9th, at the South Bend General Hospital. His testimony, in part, continues:

"Q. Did you examine this man, Mr. Laakko? A. I did. Q. About what date? A. The 9th. Q. And the 10th? A. Well every day after that for a while. . . . Q. Will you tell the jury what you found? A. I found a wound five eighths inch long and quite deep, probably two or three inches deep on the right side towards the back. Q. What did you do for him? A. There was nothing I could do but put him to bed. . . . Q. How long did you take care of him if you remember? A. Oh, three or four weeks. Q. Did it need care and attention for that length of time? A. Oh yes. Q. How deep was it? A. Oh, two inches I am sure. . . . Q. Is a wound of that kind painful or not? A. Not when first inflicted. Q. Is it subsequent to that? A. Yes."

The doctor further testified that in his opinion the wound was made with a sharp instrument; that the scar was still there and always would be.

Victor Stafford also testified that he saw Emerson knock Mrs. Barber down, but he left shortly afterward and did not see what occurred subsequently.

The above testimony was all brought out in the state's case in chief.

Mr. Emerson denied that he struck Mrs. Barber, that he threatened Mr. Laakko, or that he ever touched him. He also testified that he did not have a knife or any other sharp instrument in his hand at that time; that he never stabbed Laakko.

Appellant contends that Laakko admitted that he did not see Emerson when the latter came up behind him, but it will be remembered that Mr. Autio, the bartender, was standing on the other side of the bar, and he testified that he saw Emerson come up behind Laakko, and then described what took place. It is true no one saw anything in Emer-

son's hand, but it seems to us, after reading the evidence, including the testimony of the doctors, that the wound had the appearance of having been made with a sharp instrument, and the testimony that, when Emerson put his right arm under Laakko's right arm, he (Laakko) felt something like a thorn, and the fact that almost immediately thereafter Laakko felt his side and found his jacket cut and his side bleeding, it is impossible to escape the conclusion that Emerson did at that time cut or stab Laakko with some sharp instrument. There is no other explanation of what happened.

There is some apparent conflict between Laakko's testimony as given here and that given in justice court. There is also testimony that Laakko made no complaint. Mrs. Barber testified that she was not knocked down, and that the bartender did not pick her up. Appellant also introduced character witnesses who testified to his reputation as a law abiding citizen. However, all the witnesses were before the jury, who heard all the evidence, and apparently believed Laakko's testimony. We are satisfied there was substantial evidence tending to establish appellant's guilt of second-degree assault, as charged.

We may say there is no question but that grievous bodily harm was inflicted upon Laakko. See *State v. Ross,* 85 Wash. 218, 147 Pac. 1149.

Appellant next contends that the trial court erred in failing to instruct on third-degree assault. Appellant then refers to instructions Nos. 6 and 7, as given, wherein first- and second-degree assaults only were defined.

The court, in instruction No. 6, informed the jury that appellant was not charged with first-degree assault, but only with assault in the second degree, and that first-degree assault was defined only for the purpose of enabling the jury to understand better the charge as made. That it is proper, where the charge is second-degree assault, to define first-degree assault, as was done in this case, see *State v. Ross, supra.*

In *State v. Johnson,* 184 Wash. 493, 52 P. (2d) 317, we quoted from *State v. Reynolds,* 94 Wash. 270, 162 Pac. 358, as follows:

" 'The trial court, in its instructions, submitted to the jury the included offense of assault in the third degree. The only question here for determination is whether it was error to submit the question to the jury whether the appellant was guilty of assault in the third degree. In law, assault in the third degree is included within a charge of assault in the second degree, *but where a defendant is charged with assault in the second degree, the question whether he is guilty of assault in the third degree should not be submitted to the jury unless the facts of the particular case are such that they will sustain a conviction of assault in the third degree.' "     (Italics ours.)

In the instant case, appellant was charged with assault in the second degree, and under the evidence he was either guilty of inflicting the wound upon Laakko with a knife or other sharp instrument, as charged, or he was not guilty of any degree of assault. Inasmuch as the facts would not have justified a conviction of assault in the third degree, the trial court committed no error in refusing to instruct on the included offense of assault in the third degree. Instructions Nos. 6 and 7 properly stated the law as applied to the facts in this case. We might add that appellant proposed no instruction on third-degree assault.

■   Appellant next argues that the trial court erred in permitting the state, over appellant's objection, to introduce evidence of state patrolman Arthur Baker that Ida Barber had told him that "defendant had a knife, that he hid it or got away with it, that she would search for it and see if she could find it, that she searched for it while he was there."

This matter came up in the following manner: It will be remembered that Ida Barber is the woman who, according to the testimony of Laakko and the bartender, was knocked down by appellant. Mrs. Barber was called as a witness for appellant, and on cross-examination it was brought

out that Mrs. Barber and Emerson lived in the same house. She was then interrogated by Mr. Welsh as follows:

"Q. Do you remember of Mr. Baker and Mr. Leap and other people coming where you were that night? A. I was sleeping on the davenport. . . . Q. Do you remember of talking with Mr. Leap and Mr. A. L. Baker, or the State Patrolman Baker? A. I know Art Baker. Q. Did you talk with him about three thirty P. M. at the boat house on Water Street? A. I did. Q. Did you at that time state to them that the defendant had a knife? A. No sir. Q. Wait until I get through—but he hid it or put it away, that you would search for it and see if you could find it? A. No sir I did not. Q. You did not make that statement to them? A. I never did. Q. Or anything of that character? A. I never did. Q. Did you tell them on that occasion, no one else being present, only you and the two men I have mentioned, that he had a knife?

"Mr. Bond: I doubt if this is competent under the circumstances, but let him go ahead if he thinks he has got something. The Court: There is nothing before the court. Proceed. Mr. Bond: It is inadmissible, but let him go ahead. The Court: Is there any objection? Mr. Bond: No. Mr. Welsh: Q. That he had a knife; and did you then proceed to make some search for it in the boat house? A. No sir. Art Baker said to me: 'You know,' he said, 'it is customary for a man to have a knife'; — but I never seen Mr. Emerson have a knife. Q. You told him that? A. Yes sir I told him that."

It will be noticed that no objection was made to the above testimony.

Mr. Baker was called in rebuttal, for the purpose of impeaching Mrs. Barber. Mr. Baker testified that he and Mr. Leap talked to Mrs. Barber on Sunday, January 10th, about three-thirty p. m., at the boat house where she was living. The question was asked: "Did she at that time and place—being made in the absence of the defendant,— for the purpose of impeachment—" to which Mr. Bond objected "if made in the absence of defendant," and for the further reason that it was an attempt to impeach a witness on a collateral matter. The jury was then excused, and there followed some discussion between court and counsel

as to whether or not the question involved a collateral matter. The court permitted the state to proceed.

"Mr. Welsh: Q. You had a talk with her at that time and place? A. Yes. Q. At that time and place did she tell you and Mr. Leap that the defendant had a knife? A. Yes. . . . Q. Did she state to you that he had a knife? (Mr. Bond's objection overruled) A. Yes. Q. Did she further state that she could not find it? (Mr. Bond's objection overruled) Mr. Welsh continuing: and did she look for it while you were there? (Objection overruled) A. Yes sir she looked for the knife and told me at that time she did not know where it was."

Mr. Bond moved to strike the answer of the witness, which motion was denied.

On May 5th, the state moved that the testimony of Mr. Baker be stricken, and the court indicated it would grant the motion. The jury was then brought in, and the court made the following statement:

"This morning a witness was called to the stand, and a question propounded to Dorrance Loomis, the question being whether she had been quarantined, and objection was made to it and the court at that time reserved the ruling as to the admissibility of it. You are now instructed entirely to disregard the question as propounded by the prosecuting attorney, and if there be any answer made by the witness Dorrance Loomis to that question, you are likewise to disregard the answer entirely and not to consider either in any consideration given to this case.

"You are also instructed that the state has moved to strike the testimony this morning of Patrolman A. L. Baker with reference to questions propounded to him as to statements made by the witness Ida Barber. Therefore, that testimony, the testimony of the witness Mr. Baker, concerning the conversation at the boat house with Mrs. Barber, is stricken from the record and you are instructed now entirely to disregard Mr. Baker's testimony in that respect.

"I hope that the jury understands the court's suggestion or rather direction with reference to the testimony of both. If you have any questions now the court will be glad to answer the questions of the jury."

It may be admitted that a witness may not be impeached on a collateral matter, and while we seriously doubt that the questions asked Mr. Baker pertained to a collateral matter, under the charge here made, in any event we are satisfied the error, if error it was, in admitting Mr. Baker's testimony was cured by the action of the court in striking the testimony and instructing the jury to disregard it.

█ It is also contended that prejudicial error resulted from a question asked by the prosecuting attorney on the cross-examination of Dorrance Loomis, and her answer thereto, it being argued that the purport of this question was to convey to the jury the thought that the witness either had a venereal disease or was contaminating the armed forces some way. The question and answer follow: "Q. Are you under quarantine now? A. Yes, sir." Mr. Bond then made his objection to the question. The jury was excused, and then followed argument of counsel on the matter. The court sustained Mr. Bond's objection, whereupon the jury was called into court, and were instructed as follows:

"Members of the Jury: For the present the court sustains the objection of the attorney for the defendant to the question propounded, last propounded to the witness, and if inadvertently any answer got into the record, the jury at this time is instructed to disregard the answer at this time."

The court subsequently gave the further instruction to the jury hereinbefore set out, made by the court at the time of instructing them relative to Mr. Baker's testimony. It will be understood that no further questions were asked this witness on the subject under discussion. We are of the opinion that it cannot be said that the question and answer were prejudicial, but if it was error the error was entirely cured by the cautionary instruction given by the court.

We have carefully considered the record, and we are

convinced that the judgment entered herein must be, and it is, in all respects affirmed.

SIMPSON, C. J., BEALS, BLAKE, and GRADY, JJ., concur.

[1]Reported in 144 P. (2d) 238.